1    ROBERT M. YASPAN, SBN 051867
     JOSEPH G. McCARTY, SBN 151020
2    DEBRA R. BRAND, SBN 162285
     LAW OFFICES OF ROBERT M. YASPAN
3    21700 Oxnard Street, Suite 1750
     Woodland Hills, California 91367
4    Telephone:  (818) 905-7711
     Facsimile: (818) 501-7711
5

6    *General Counsel for Debtor-in-Possession/Plaintiff*

7

8                     UNITED STATES BANKRUPTCY COURT

9           CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION

10

11   IN RE:                          ) Chapter No.: 11
                                     )
12   BIODATA MEDICAL LABORATORIES,   ) Case No.: 6:16-bk-20446-MW
     INC.                            )
13                                   ) Adv. No.:  6:16-ap-01298
              Debtor                 )
14                                   ) AMENDED COMPLAINT FOR:
                                     )
15   BIODATA MEDICAL LABORATORIES,   )  1.  DECLARATORY RELIEF;
     INC.                            )  2.  AVOIDANCE OF PREFERENTIAL
16                                   )      TRANSFERS PURSUANT TO 11 U.S.C
              Plaintiff.             )      SECTION 547;
17                                   )  3.  AVOIDANCE OF LIEN AND
              vs.                    )      EQUITABLE SUBORDINATION
18                                   )      PURSUANT TO 11 U.S.C SECTION
     PEARL BETA FUNDING, LLC ; and   )      510(c);
19   MERCHANT SOURCE, INC.           )  4.  AVOIDANCE AND PRESERVATION
                                     )      OF CLAIMS PURSUANT TO 11 U.S.C
20            Defendants.            )      SECTIONS 502, 506, 544, AND 510(c);
                                     )  5.  AVOIDANCE OF FRAUDULENT
21                                   )      TRANSFER PURSUANT TO 11 U.S.C
                                     )      SECTION 548 ;
22                                   )  6.  AVOIDANCE OF FRAUDULANT
                                     )      TRANSFERS PURSUANT TO 11 U.S.C
23                                   )      SECTION 544 AND 548;
                                     )  7.  USURY AND UNJUST
24                                   )      ENRICHMENT/DISGORGEMENT;
                                     )  8.  INJUNCTION;
25                                   )  9.  DETERMINING EXTENT OF LIENS
                                     )      PURSUANT TO 11 U.S.C SECTION
26                                   )      502, 506  AND 551;
27
28

1

2

3

4

5

6

7

8

9

10

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

10. OBJECTION TO PROOF OF CLAIM
NO. 32-1 AND/OR AMENDMENTS
AND/OR SUCCESSOR PROOFS OF
CLAIM PURSUANT TO 11 U.S.C
SECTION 502, 506,  AND 551;
11. VACATING CONFESSION OF
JUDGMENT;
12. UNCONSCIONABILITY;
13. VIOLATION OF N.Y. GENERAL
BUSINESS LAW SECTION 349;
14. VIOLATION OF CALIFORNIA
BUSINESS AND PROFESSIONS CODE,
SECTION 17200; AND
15.  FRAUD

11

12

Plaintiff BioData Medical Laboratories, Inc., the Chapter 11 debtor and debtor-in-possession herein (the "Debtor" or "Plaintiff"), alleges as follows:

13

14

**JURISDICTION**

15

16

17

18

19

1.    This Court has jurisdiction under 28 U.S.C. sections 157 and 1334(b) and 11 U.S.C. sections 105 and 506 of the subject matter of Plaintiff's claims for relief in this adversary proceeding.  The claims for relief arise under Title 11 of the United States Code and are related to Plaintiff's Chapter 11 case pending under Title 11 in the United States Bankruptcy Court for the Central District of California.

20

21

22

23

2.    This is a core proceeding under 28 U.S.C. section 157(b).  Regardless of whether this is a core proceeding, consent is hereby given for the entry of final orders and judgments by the Bankruptcy Court.

24

25

26

27

28

3.    Pursuant to 28 U.S.C. section 1409, venue is proper in the Central District of California because Plaintiff's Chapter 11 Bankruptcy case is pending in this district and division.  The solicitation and execution of the loan agreement at issue herein took place in California.  As set forth below, the loan agreement was a "contract of adhesion" and Plaintiff did not have any opportunity to effectively negotiate regarding the terms of the loan agreement.

The alleged "Confession of Judgment" and the usurious nature of the loan at issue is contrary to important public policy of the State of California thereby vitiating any alleged choice of law and choice of forum set forth in the documents. Furthermore, the issues regarding the alleged loan agreement and related matters are similarly addressed under the law of the State of California and New York and the ultimate ruling of the court should not be significantly affected by any choice of law issues.

## PARTIES

4.      Bio-Data Medical Laboratories, Inc. ("Bio-Data" or "Plaintiff") is a California corporation, operating as a debtors-in-possession under the United States Bankruptcy Code ("Code") with certain powers of a trustee as specified in the Code.

5.      Defendant Pearl Beta Funding, LLC ("Pearl) is a Delaware limited liability company which, Plaintiff is informed and believes and thereupon alleges, maintains its principal place of business in the State of New York, but does business throughout the State of California, including but not limited to, in the County of Riverside, State of California.

6.      Defendant Merchant Source, Inc. ("MSI") is a corporation which, Plaintiff is informed and believes and thereupon alleges, maintains its principal place of business in the State of New York, but does business throughout the State of California, including but not limited to, in the County of Riverside, State of California.

7.      On November 28, 2016 (the "Petition Date"), Plaintiff commenced its reorganization by filing a voluntary petition for relief under chapter 11 of title 11 of the Code.

8.      Plaintiff is continuing in possession of its assets and is operating and managing its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9.      Plaintiff owns and operates a medical testing business that provides medical test services for insurance and government entity health providers with over 18 branches, as of the

1   Petition Date, located in several areas of California.  Prior to 2013, Debtor was profitable and

2   had a positive cash flow.

3          10.     In or about 2013, Plaintiff fell victim to a series of predatory lenders that used

4   fraudulent, illegal, deceptive, and/or unethical means to defraud and deceive Plaintiff into

5   entering into a series of fraudulent, illegal and usurious loans.  Said predatory lenders tricked

6   Plaintiff into signing fraudulent, false, and misleading documents, thereby causing Plaintiff to

7   enter into unfair and usurious loans which further depleted Plaintiff's financial condition.

8

9          11.     Pearl is one such predatory lender.  It specializes in providing fast, high interest,

10  loans to small businesses and is one of many entities that engage in the making of "cash

11  advance" loans that are sometimes referred to as "merchant cash advances ("MCA").  MSI is

12  also involved in the in the making of cash advances ("MCA Business") and is also a broker

13  and/or lender in the transactions.  (Pearl and MSI will sometimes hereinafter be referred to

14  collectively as "Defendants").

15

16  **PREDATORY LENDING AND THE MERCHANT CASH ADVANCE LOAN**

17  **BUSINESS**

18         12.     Over the last decade the MCA business has emerged as a very high interest

19  lending scheme targeting cash short small businesses and the companies in the MCA Business

20  have become one of the major suppliers of credit to small businesses.  Plaintiff is informed and

21  believes, and thereupon alleges, that the MCA developed as a supposedly quick and dirty

22  attempt to get around the regulations for traditional factoring financing and usury laws.

23         13.     Plaintiff is informed and believes, and thereupon alleges, that MCA lenders send

24  out mass mailers to small businesses and rely on high pressure phone sales tactics to close the

25  loans.

26

27         14.     The loans are marketed as a way for a borrower to obtain quick money with,

28  what initially appears to be, relatively small payments.  However, these payments are collected

on a daily basis by automatic Electronic Fund Transfers or Automated Clearing House debits (together, "EFT") and the relatively small daily payments become large monthly payments and a severe drag on the business' cash flow.

15.    In a typical transaction the borrowers, loan officers and the lenders never meet. The paperwork exchange is minimal.  The lenders count on the fact that the borrowers are desperate for money and do not have the time to seek other, and cheaper, forms of financing.

16.    MCA lenders prey on vulnerable businesses that need cash quickly and/or not sophisticated enough to understand the true nature of the MCA Business.  The cumulative effect of the daily automatic EFT payments exacerbates a company's cash flow issues.

17.    The loan application and approval typically takes place on the phone.  Most of the documents created by the MCA lender are not seen by the borrower until very shortly before funding and they are not explained to the borrower or the borrower's principals.

18.    The issues with the loans are numerous and include, without limitation:

A.    Although, the transactions are proposed as a loan – i.e. a "cash advance", the documentation attempts to construe the transaction as an alleged "sale" of a portion of a company's future "receipts" or "proceeds".

B.    The form of the transaction bears a surface resemblance to "factoring" arrangements" wherein specific accounts receivable are sold to a factor.  However, here there is no documentation relating to the alleged sale of any specific account receivable to the alleged assignee.  The "seller" (or "borrower") continues to have title to the receivable's proceeds, collects the proceeds itself, and continues to bill the customer directly.

C.    There is no evidence of any transfer of title (or "sale") of, or to, anything. Nor is there any change in possession to the assets allegedly being "sold".

D.    While the payments to Pearl are, in the documentation, allegedly tied to the amount of the proceeds of the accounts receivable that are collected on a daily business, the

payments are taken from the business' checking account on a daily basis are the same amount regardless of the presence or absence of "receipts" or "proceeds" in the account on that day. There is no effective "fact-checking" by Pearl to determine that what is being taken is indeed what has been allegedly "sold".

E.    The lender does not assume any of the ordinary risks of loss that comes with the ownership of "account receivable proceeds" as would, for example, occur in a typical "factoring" arrangement. The "risk of loss", i.e., nonpayment of the future accounts receivable, remains with the Plaintiff. The only alleged risks of loss that were allegedly assumed by Pearl were related to the failure of the entire enterprise in bankruptcy or going out of business and were illusory as set forth below.

F.    The loan documentation includes "broad form" security agreements that are similar to the documentation signed in a loan transaction, not a sale of proceeds transaction.

G.    The loans typically have guaranties that are similar to a loan transaction, not a purchase transaction. .

H.    The loans typically require the borrower and the guarantors to execute a confession of judgment prior to the transfer of the monies in an unknown amount that does not make any sense in a "purchase" context since the MCA lender supposedly already owns the "receipts" or "proceeds". Instead, the guarantees, agreement, and confession of judgment together make the transaction function exactly the same as a "full recourse" loan.

I.    The default provision typically have non-payment (in some form or context) as a default which does not make any sense regarding an alleged sale transaction since the MCA lender  supposedly owns the asset and are more typical for loans.

J.    There is no attempt to separate the alleged portion of the borrower's "Receipts" that supposedly belongs to the lender and there is no separate bank account to hold the assets allegedly being sold.

K.      The loans are typically usurious with interest rates ranging into the hundreds of percent on an annual percentage rate ("APR") basis.

L.      There is no attempt to comply with the law and regulations regarding loans and usury.

M.      There are no informational disclosures as required by California law.

N.      The lenders typically rely on the fiction that the transaction is a sale rather than a loan and do not follow the letter or spirit of California Finance Lender law and/or deny that they are in fact lenders.

O.      The loan documentation and funding are provided with no real opportunity for review or negotiation – i.e. are contracts of adhesion.

P.      The business and tax records of the Plaintiff reflect a loan transaction rather than a sale under the standards of the Financial Accounting Standards Board.

Q.      If the transaction is indeed a purchase and sale of accounts receivable and the other assets referred to in the UCC-1s that are allegedly filed, the "purchaser" should have paid sales tax to the State of California, and the "seller" should have recorded the transaction as a sale on its federal and state income tax returns.  However, neither has occurred; a fact more in common with a loan transaction than a purchase transaction.

R.      Additionally, to the extent that for any reason the transaction is deemed not to be a loan, Plaintiff contends that the transaction also appears to constitute a joint venture and/or equity participation agreement and/or other exotic and/or hybrid transaction.

19.      These numerous issues would ordinarily make the MCA loans subject to challenge as being fraudulent, usurious, illegal, deceptive, predatory, and/or unethical transactions that are not enforceable.   However, the MCA lenders rely on the financial weakness and naiveté of the borrowers and the use of highly questionable legal tactics, including, without limitation, confessions of judgments and individual guaranties to assert their

highly questionable legal fiction of ownership.  As such, many, if not most of the businesses end up going out of business and/or are not able to protect their rights.  The MCA lenders then use their grossly unfair and obscene profits in a sort of reverse *Ponzi* scheme to make more loans to other susceptible business owners.  As such, the business has seen rapid growth over the last few years.

20.     The Debtor is one of the many victims of this pervasive scam and scheme.   Pearl is such an MCA lender.

**The Pearl Loan**

21.     On or about June 23, 2016, Plaintiff borrowed the sum of $112,671 from Pearl (the "Pearl Loan").  Copies of the alleged documentation for the Pearl Loan that have been produced by Defendants are attached hereto as Exhibit A (the "Loan Documents" or "Loan Documentation").  Although Defendants contends that the Loan Documents describe the transaction as simply an alleged purchase of assets - i.e. the defined term "Receivables", a closer examination of the entirety and effect of the transaction and the actual terms of the Loan Documents and statements and actions of the parties are inconsistent with and fail to support Defendants' contentions as set forth below.

22.     Plaintiff contends that the Pearl Loan was, in fact, actually a loan of money to be repaid by money – i.e. a loan of money as supported by both the express intent and actions of the parties.  However, as also set forth below, to the extent that the Court determines that all or any part of the Pearl Loan was not actually the loan of money, Plaintiff contends that the Pearl Loan constitutes a joint venture between Plaintiff and Defendants and/or the purchase of an equity interest in Plaintiff, and/or an entirely different exotic and/or hybrid transaction the effect of which the Court will have to determine.   What the Pearl Loan is **not** is a purchase of assets and even if it somehow were, in part or even in whole, intended to be a purchase of assets, said purchase was not and could not be effectively accomplished pursuant to the alleged

1    Loan Documentation and the actions of the parties to the Pearl Loan.

2    **The Terms of the Pearl Loan**

3    23.    The Loan Documents contain numerous ambiguities and inconsistencies and

4    appear to be a patched together amalgamation of different contracts and contractual provisions

5    that have been altered in an apparent attempt to avoid the dictates and public policy

6    considerations of contract, usury, and lending law.  The resulting amalgamation leaves open

7    many issues regarding the nature and effect of the transaction.  For example, the Loan

8    Documentation attempts to describe the transaction in the form of a purchase of 15% of

9    Plaintiff's "Receipts" ostensibly in the amount of $167,880 by an advance in the amount of

10   $112, 671.  The advance was to be repaid in the total amount of $167,880 in 120 equal

11   installments of $1,399 which results in an aggregate payment of $55,209 in interest when the

12   transaction is analyzed as a loan.[1]  Although, the Loan Documents were drafted in the form of

13   an alleged purchase of Plaintiff's "Receipts" under the included "Merchant Agreement," as set

14   forth more fully below, the agreement can more properly be interpreted as, an agreement

15   whereby Pearl loaned Plaintiff the sum of $112,671 payable in 120 equal installments of

16   $1,399 resulting in an aggregate payment of $167,880.

17   24.    "Receipts" is defined in the Loan Documents (specifically in the Merchant

18   Agreement) as "all payments made by cash, check, electronic transfer or other form of

19   monetary payment in the ordinary course of the Merchant's business" – in short, the term

20   "Receipts" is limited to actual cash <u>received</u>.  Therefore, the alleged transaction is an advance

21   of funds with the agreement that the advance will be paid back from funds received (the

22   Receipts – i.e., cash) in the future – a transaction that has the same effect as a loan and should

23   be considered to be a loan.   The effective annual interest rate was, at least, 210%.  Plaintiff

24   paid Pearl additional fees of which further increased the effective interest rate of the Loan in

---

[1] It would not be reasonably equivalent value if analyzed as a transfer of personal property.

excess of 210%.[2]  The Loan Documents include a "broad form" security agreement.   However, there is no UCC-1 Financing Statement that identifies Pearl as the creditor.

**The Pearl Misrepresentations**

25.    The Debtor dealt with both Pearl and Merchant Source, Inc. ("MSI"), a company that was an agent of Pearl regarding the Pearl Loan.  Both Pearl and MSI had actual knowledge of each other's misrepresentations and wrongful actions and actually participated in and/or ratified and approved each other's misrepresentations and wrongful action.  During the discussion regarding the Pearl Loan, among other material misrepresentations, Defendants Pearl and MSI represented as follows:

A.    That Pearl was operating as a lender and was making a loan that complied with the laws and regulations of the State of California and that was not misleading, fraudulent, or deceptive;

B.    That the transaction would be a loan of $120,000 which would all be paid to Plaintiff at the close;

C.    Both before and after the Pearl Loan was executed, Defendants referred to the Pearl Loan as a loan, orally and in writing, and used terms that apply to loan transaction rather than purchase transaction, including, without limitation: (i) use of the term "consolidation" in an email dated June 14, 2016 from Alan Smith, Senior Financial Consultant of MSI on behalf of Defendants ("Smith"), to Plaintiff regarding the transaction; (ii) use of the term "borrower" in an email dated June 20, 2016 from Smith to Plaintiff regarding the transaction;  (iii)  Plaintiff's use of the term "loan" in an email dated June 23, 2016 from Smith to Plaintiff regarding the transaction; (iv) use of the term "loan" in an email dated August 2, 2016 from Smith to Plaintiff regarding the Pearl Loan dated August 2, 2016, (v)  use of the terms "renewal" and "refinance" in an email dated September 15, 2016 from Smith to Plaintiff regarding the Pearl Loan; (vi) use

---

[2] The loan agreements are ambiguous regarding the actual interest rate since they also state that **no interest is due which should be interpreted to be a loan at 0% interest.**

of the terms "renew" and "lender" in an email dated October 12, 2016 from Smith to Plaintiff regarding the Pearl Loan; and (vii) use of the term "renewal" in an email dated October 24, 2016 from Smith to Plaintiff regarding the Pearl Loan; and (viii) use of the words "collection" in an email notice dated November 23, 2016 from Karen Saunders of Pearl Capital, Collections Specialist regarding the Pearl Loan.

D.      That the proposed loans would earn interest at less than the legal rate and that the payments could be made from Plaintiff's cash flow without interfering with Plaintiff's ability to do business;

E.      That daily payment amount would not exceed the lower of $1,399 or 15% of Plaintiff's receipts from its accounts receivable for that day and that the $1,399 daily payment was equivalent to 15% of Plaintiff average daily gross receipts;

F.      The interest rate on the Pearl Loan would not exceed 10% per year and was a legal rate;

G.      They misrepresented and failed to expressly state the actual interest rate on the loan and failed to make federal and state mandated disclosures regarding the Pearl Loan; and

H.      Represented that the Pearl Loan complied with all applicable laws.

**The Pearl "Loan" as a Loan**

26.      Although the Loan Documents assert that the transaction involved the purchase of "Receipts", the transaction, when viewed in its totality, is a loan transaction.  At all relevant times, Plaintiff considered the transaction to be a short-term business loan.  The communications from Defendants discussed the transaction as a loan and used terms that would only apply to loans both before and after the funding of the Pearl Loan.   At no point, did Plaintiff ever seek to sell an interest in its accounts receivable, receipts, or proceeds.  Plaintiff is informed and believes, and thereupon alleges, that Defendants Pearl and MSI did not underwrite the transactions based on the collectability risk of Plaintiff's customers or their

ability to pay, rather, the only issue considered was Plaintiff's cash flow.

27.    The form of the Loan Documentation for the Pearl Loan transaction was dictated solely by Defendants Pearl and MSI who acted with the intent to disguise the true nature of the transaction.  The breaches of the representations of Pearl and MSI and other issues with the Pearl Loan are numerous and include, without limitation:

A.    Although, the transactions was proposed by Defendants Pearl and MSI as a loan, the Loan Documentation attempts to construe the transaction as an alleged "sale" of a portion of a company's future "Receipts";

B.    There was no effective transfer of title to any alleged "Receipts" and could not be since the definition of "Receipt" limits it to cash received and the referenced cash had not yet been received;

C.    The payments are made on a daily basis in the same amount regardless of the amount of "Receipts" for that day;

D.    The term "Specific Amount" is not defined in the Loan Documents which renders it ambiguous and uncertain;

E.    Pearl purposefully overstated the "Specified Percentage" at 15% such that Plaintiff's gross receipts would have to decline disastrously and well below the amount it had on the Filing Date before any alleged provision to reduce the daily payment could take effect rendering the provision illusory and of no effect[3];

F.    To the extent that the term "Specific Amount" is determined to be equal to the daily payment amount of $1,399, any alleged risk of loss or agreement to reduce the daily payment is illusory because the daily payment amount was not based upon the actual "Specified Percentage" of Plaintiff's average daily gross receipts at the time the Pearl Loan was initiated – in short, Plaintiff's business would have to fail before it could have any effect;

---

[3] In fact, Plaintiff's cash flow would have to decline to the point that it was out of business before it could attempt to utilize the provision rendering it entirely useless.

G.    Pearl did not actually and effectively assume any of the ordinary risks of loss that comes with ownership of the future accounts receivable (for example, among other risks, the non-collectability of accounts) or any other risk since, among other recourse, it also had guaranties and a confession of judgment to recover all alleged amounts due under the Pearl Loan;

H.    The Pearl Loan included an alleged "broad form" security agreement that is inconsistent with ownership of any alleged "Receipts";

I.    The Pearl Loan included an alleged guaranty that is inconsistent with the contention that the transaction was a purchase and sale of any alleged future "Receipts";

J.    Pearl Loans required Plaintiff to execute a confession of judgment which is inconsistent with ownership of any alleged "Receipts" and makes the transaction in effect a "full recourse" loan;

K.    The Loan Documents, in general, do not use the term loan but are inconsistent with an alleged sale of "Receipts" which renders them ambiguous and uncertain as well as misleading, deceitful and/or fraudulent;

L.    Default provisions in the Loan Documents makes non-payment both directly and indirectly a default which is inconsistent with an alleged sale of "Receipts";

M.    The Loan Documents do not attempt to separate the alleged portion of the borrower's "Receipts" that supposedly belongs to Pearl and there is no separate bank account for the alleged "Receipts" belonging to Pearl;

N.    The Pearl Loan is usurious under both California and New York law (in fact, criminally usurious under New York law) and the high costs of the loan caused the balance transferred to Plaintiff to substantially less than the amount promised;

O.    Pearl misrepresented its intent to act as a lender and attempted to draft the Loan Documentation to be something other than a loan, did not comply with the regulations regarding

a loan, used deceitful, fraudulent and/or misleading tactics and documentation; and violated both the letter and intent of California Finance Lender law and therefore Pearl did not rely and cannot claim it can rely on any alleged exemptions allegedly available to a finance lender in California;

P.    The Loan Documentation and funding were provided with no real opportunity for review or negotiation – i.e. are contracts of adhesion;

Q.    The was no UCC-1 filed regarding the Pearl Loan and any alleged security interest was not perfected; and

R.    The business and accounting records of both Plaintiff and Pearl treated the transaction as a loan under the standards of the Financial Accounting Standards Board.

**The Pearl Loan as a Joint Venture, Equity Participation; and/or Some Other Exotic Hybrid Transaction**

28.    Although the Loan Documents assert that the transaction involved the purchase of "Receipts", the transaction, when viewed in its totality, is a loan transaction.  At all relevant times, Plaintiff considered the transaction to be a short-term business loan.

29.    However, to the extent that the Court determines that all or any part of the Pearl Loan was not actually the loan of money, alternatively, Plaintiff contends that the Pearl Loan constitutes a joint venture between Plaintiff and Defendants and/or the purchase of an equity interest in Plaintiff, and/or an entirely different and exotic and/or hybrid form of transaction the effect of which the Court will have to determine.  The form of the documentation for the transaction was dictated solely by Defendants Pearl and MSI with the intent to disguise the true nature of the transaction and, to the extent the Court were to determine that the transaction was not a loan, the following further issues regarding the effect of inconsistencies in the Loan Documentation as well as risk assumption and control issues are raised that include, without limitation:

A.    Although, the definition of "Receipts" is limited to cash, the same provision the Loan Documents (specifically in the Merchant Agreement) refers to "future accounts, contract rights and other entitlements" which could be consistent with both a joint venture as a share of revenue rights as well as an equity participation relationship and/or could possibly be some exotic hybrid transaction;

B.    Although the Loan Documentation makes numerous attempts to disclaim that it is a loan there are no such disclaimers of a joint venture or equity participation relationship;

C.    The Loan Documentation states that there is "no interest rate or payment schedule and no time period"[4] which is consistent with a joint venture as well as an equity participation relationship and/or could possibly be some exotic hybrid arrangement;

D.    The Loan Documentation provides for the assumption of some alleged risk of bankruptcy, "going out of business", or that the business may "slow down or fail"[5] which is consistent with a joint venture relationship as well as equity participation and/or other exotic hybrid transaction;

E.    The Loan Documentation provides for Pearl's participation in Plaintiff's business to be raised to 100% of the "Receipts" in the event of some breaches which could be consistent with a joint venture, equity or other exotic hybrid relationship;

F.    The Loan Documents provides for Pearl to make advances which is consistent with a joint venture, equity or other exotic hybrid relationship;

G.    The Loan Documentation provides for participation in control by providing that Pearl have all "information, authorization, and passwords" for all of Plaintiff's accounts which could be consistent with a joint venture, equity or other exotic hybrid relationship;

---

[4] It should be noted that this language is inconsistent with other provisions of the Merchant Agreement that sets forth  payment amounts and provide for daily payments from which a payment schedule, time period and effective interest rate can be calculated albeit with some difficulty.  The inflated "Specific Percentage" makes any provision to adjust payments illusory and the contention of non-payment risk is arguably indistinguishable from ordinary risk of non-payment of a loan.

[5] It should also be noted that this language is inconsistent with other provisions of the Merchant Agreement that provide recourse in such events.

H.    The Loan Documentation provides for participation in control by providing that Pearl has authorization to withdraw payment from Plaintiff's accounts which could be consistent with a joint venture, equity or other exotic hybrid relationship;

I.    The Loan Documentation provides for participation in control by providing Pearl with a broad irrevocable power of attorney over Plaintiff's business which could be consistent with a joint venture, equity or other exotic hybrid relationship;

J.    The Loan Documentation provides that Pearl's authorization for access to Plaintiff accounts is "irrevocable" which is consistent with a joint venture and could be consistent with equity or other exotic hybrid relationship;

K.    The Loan Documentation provides for participation in control by providing that Pearl can control the amount paid to itself and time to pay Plaintiff's obligations which could be consistent with a joint venture, equity or other exotic hybrid relationship; and

L.    Although the Loan Documentation allegedly waives liability for claims made by Plaintiff and the alleged Guarantor's for some claims there is no attempt to disclaim liability to third parties and no indemnity provision for liability to third parties.

30.    Plaintiff and its owners were not represented by counsel at the time the Loan Documents were executed. They did not understand the Loan Documents at the time they were sent to them and they did not have time to review them and/or have an attorney review them. As a result, Plaintiff entered into the Loan Documents and its owners, and other alleged third parties entered into, executed the alleged guaranties (the "Guaranties") and an alleged confession of judgment (the "Confession of Judgment"). Additionally, onerous costs, fees and alleged penalties were included with the Loan Documents that were not previously discussed, were usurious, and were not in compliance with applicable law.

31.    Because of the representations made by Defendants and the immediate need for the funds, Plaintiff and its owners executed the Loan Documents without question and without

adequate review.  Defendants did not give Plaintiff any opportunity to discuss, object, or propose changes to the alleged documents.  At the time the Loan Documents were executed, Plaintiff believed that it was executing a simple loan transaction and would not have executed a document that purportedly allowed Pearl to enter judgment against Plaintiff without a trial and opportunity to a defense in court.

32.    The Loan Documents that were signed did not list any accounts that were purportedly the subject of the sale; nor, did Defendants ever contact any of Plaintiff's customers to investigate or assess their ability to pay, or to demand direct payment (as would a factor, for instance).  There was also no effective transfer of ownership of any "Receipts" to Defendants as a consequence of any alleged sale -- ownership of the "Receipts" remained with Plaintiff.  The Loan Document did not mention or attempt to transfer any risk with regard to any particular "Receipts".  The approval of the Pearl Loan was not based on any risk assessment of any particular "Receipts".   The business and accounting records of both Plaintiff and Pearl treated the transaction as a loan under the standards of the Financial Accounting Standards Board.

33.    The Loan Documents made the payment of the daily specified amounts as an unconditional requirement regardless of whether Plaintiff had recovered receivables sufficient to cover that amount.  Moreover, Pearl did not actively attempt to collect on any alleged receivables directly from Plaintiff's customers.  Instead, they simply took the loan repayment amounts directly from Plaintiff's business accounts without regard to how those amounts were generated.  In fact, in order to repay the daily specified amounts, Plaintiff was required to go out and obtain additional loans that had nothing to do with customer receivables.  Plaintiff is informed and believes, and thereupon alleges, that these additional loan funds were taken by Pearl knowing that they were not the product or proceed of any customer receivables.

34.    Just prior to the bankruptcy filing, Pearl filed and obtained a Judgment by

Confession on or about November 25, 2016 (the "Confession of Judgment") and then immediately instituted actions to seize bank accounts of Plaintiff and its owners at Bank of America with, at least, one account belonging to one of Plaintiff's owners, Henry Wallach, being frozen.

### Validity, Amount and Security of Alleged MCA Claims

35.    The present estimated amount of total alleged secured claimants in Plaintiff's Bankruptcy is in excess of $2,900,000.  Plaintiff has not presently been able to determine the alleged amounts, the alleged security, or the alleged priority of a number of the alleged creditors due to the filings by alleged "representatives" that disguise the true name of any creditor.  There are also approximately 40  UCC-1 Financing Statements that have been recorded. There are currently three MCA creditors, Merchant Cash and Collateral ("MCC"), Pearl and Yellowstone Capital West, LLC ("Yellowstone"), that apparently claim to be either secured creditors of the Debtor or the owner of a portion of the Debtor's future accounts receivable.

36.    Plaintiff's assets currently consists mostly of its accounts receivable which currently total an amount in excess of  $2.9 million which together with the other assets have and estimated fair market value of about $1,250,000.  Plaintiff contends that the three MCA creditors (including Pearl) do not have perfected security interests and/or are unsecured or under-secured because of senior liens and/or failure to perfect any alleged lien.

37.    Even though the loan documentation for the Pearl Loans provided for an alleged security interest, there is no evidence in the record that any UCC-1s were filed.  In fact, the documents fail to grant any security interest at all since they fail to adequately identify and/or segregate the alleged "Future Sale Proceeds".  No specific "proceeds" are identified and there is not even a separate account for any alleged "Receipts" that supposedly belong to Pearl.

# FIRST CLAIM FOR RELIEF

(Declaratory Relief re the Nature of Transaction, the Validity, the Priority, the Amount, and the Extent of Lien and Claim– against Defendants)

38.    Plaintiff hereby incorporates by reference paragraphs 1 through 37 inclusive, as if fully set forth herein.

39.  The issues with the Pearl Loan are numerous and include, without limitation:

A.    Although, the transactions was proposed by Defendants Pearl and MSI as a loan, the Loan Documentation attempts to construe the transaction as an alleged "sale" of a portion of a company's future "Receipts";

B.    There was no effective transfer of title to any alleged "Receipts" and could not be since the definition of "Receipts" limits it to cash received and the referenced cash had not yet been received;

C.    The payments are made on a daily basis in the same amount regardless of the amount of "Receipts" for that day;

D.    The term "Specific Amount" is not defined in the Loan Documents which renders it ambiguous and uncertain;

E.    Pearl purposefully overstated the "Specified Percentage" at 15% such that Plaintiff's gross receipts would have to decline disastrously and well below the amount it had on the Filing Date before any alleged provision to reduce the daily payment could take effect rendering the provision illusory and of no effect[6];

F.    To the extent that the term "Specific Amount" is determined to be equal to the daily payment amount of $1,399, any alleged risk of loss or agreement to reduce the daily payment is illusory because the daily payment amount was not based upon the "Specified Percentage" of Plaintiff's average daily gross receipts at the time the Pearl Loan was initiated – in short, Plaintiff's business would have to fail before it could have any effect;

---

[6] In fact, Plaintiff's cash flow would have to decline to the point that it was out of business before it could attempt to utilize the provision rendering it entirely useless.

G.    Pearl did not actually and effectively assume any of the ordinary risks of loss that comes with ownership of the future accounts receivable (for example, among other risks, the non-collectability of accounts) or any other risk since, among other recourse, it also had guaranties and a confession of judgment to recover the alleged amount due under the Pearl Loan;

H.    The Pearl Loan includes an alleged "broad form" security agreement that is inconsistent with ownership of any alleged "Receipts";

I.    The Pearl Loan includes an alleged guaranty that is inconsistent with the contention that the transaction was a purchase and sale of any alleged future "Receipts";

J.    Pearl Loans required Plaintiff to execute a confession of judgment which is inconsistent with ownership of any alleged "Receipts" and makes the transaction in effect a "full recourse" loan;

K.    The Loan Documents, in general, do not use the term loan but are inconsistent with an alleged sale of "Receipts" which renders them ambiguous and uncertain as well as misleading, deceitful and/or fraudulent;

L.    Default provisions in the Loan Documents makes non-payment both directly and indirectly a default which is inconsistent with an alleged sale of "Receipts";

M.    The Loan Documents do not attempt to separate the alleged portion of the borrower's "Receipts" that supposedly belongs to Pearl and there is no separate bank account for the alleged "Receipts" belonging to Pearl;

N.    The Pearl Loan is usurious under both California and New York law (in fact, criminally usurious under New York law) and the high costs of the loan caused the balance transferred to Plaintiff to substantially less than the amount promised;

O.    Pearl misrepresented its intent to act as a lender and attempted to draft the Loan Documentation to be something other than a loan, did not comply with the regulations regarding

a loan, used deceitful, fraudulent and/or misleading tactics and documentation; and violated

both the letter and intent of California Finance Lender law and therefore Pearl did not rely and

cannot claim it can rely on any alleged exemptions from California usury law allegedly

available to a finance lender in California;

     P.     The Loan Documentation and funding were provided with no real opportunity for

review or negotiation – i.e. are contracts of adhesion;

     Q.     The business and accounting records of both Plaintiff and Pearl treated the

transaction as a loan under the standards of the Financial Accounting Standards Board;

     P.  At all relevant times, Plaintiff considered the transactions to be short-term business

loans;

     R.     At no point, did Plaintiff ever seek to sell an interest in its accounts receivable,

receipts, or proceeds;

     S.     The was no UCC-1 filed regarding the Pearl Loan and any alleged security

interest was not perfected;

     T.     Any alleged exemption from California usury law could not have any effect on

New York usury law; and

     U.     Plaintiff is informed and believes, and thereupon alleges, that Pearl and MSI did

not underwrite the transactions based on the collectability risk of Plaintiff's customers or their

ability to pay.

     40.     To the extent that the Court determines that all or any part of the Pearl Loan was

not actually the loan of money, alternatively, Plaintiff contends that the Pearl Loan constitutes a

joint venture between Plaintiff and Defendants and/or the purchase of an equity interest in

Plaintiff, and/or an entirely different and exotic and/or hybrid form of transaction the effect of

which the Court will have to determine.  The form of the Loan Documentation for the

transaction was dictated solely by Defendants Pearl and MSI with the intent to disguise the true

nature of the transaction and, to the extent the Court were to determine that the transaction was

not a loan, the following further issues regarding the effect of inconsistencies in the Loan

Documentation as well as risk assumption and control issues need to be determined that

include, without limitation:

    A.    Although, the definition of "Receipts" is limited to cash, the same provision in

the Loan Documents (specifically the Merchant Agreement) refers to "future accounts, contract

rights and other entitlements" which could be consistent with both a joint venture as a share of

revenue rights as well as an equity participation relationship and/or could possibly be some

exotic hybrid transaction;

    B.    Although the Loan Documentation makes numerous attempts to disclaim that it

is a loan there are no such disclaimer of a joint venture or equity participation relationship;

    C.    The Loan Documentation states that there is "no interest rate or payment

schedule and no time period"[7] which is consistent with a joint venture as well as an equity

participation relationship and/or could possibly be some exotic hybrid arrangement;

    D.    The Loan Documentation provides for the assumption of some alleged risk of

bankruptcy, "going out of business", or that the business may "slow down or fail"[8] which is

consistent with a joint venture relationship as well as equity participation and/or other exotic

hybrid transaction;

    E.    The Loan Documentation provides for Pearl's participation in Plaintiff's business

to be raised to 100% of the "Receipts" in the event of some breaches which could be consistent

with a joint venture, equity or other exotic hybrid relationship;

    F.    The Loan Documentation provides for Pearl to provide advances which is

---

[7] It should be noted that this language is inconsistent with other provisions of the Merchant Agreement that set forth payment amounts and provide for daily payments from which a payment schedule, time period and effective interest rate can be calculated albeit with some difficulty. The inflated "Specific Percentage" makes any provision to adjust payments illusory and the contention of non-payment risk is arguably indistinguishable from ordinary risk of non-payment of a loan.

[8] It should also be noted that this language is inconsistent with other provisions of the Merchant Agreement that provide recourse in such events.

consistent with a joint venture, equity or other exotic hybrid relationship;

G.    The Loan Documentation provides for participation in control by providing that Pearl have all "information, authorization, and passwords" for all of Plaintiff's accounts which could be consistent with a joint venture, equity or other exotic hybrid relationship;

H.    The Loan Documentation provides for participation in control by providing that Pearl has authorization to withdraw payment from Plaintiff's accounts which could be consistent with a joint venture, equity or other exotic hybrid relationship;

I.    The Loan Documentation provides for participation in control by providing Pearl with a broad irrevocable power of attorney over Plaintiff's business which could be consistent with a joint venture, equity or other exotic hybrid relationship;

J.    The Loan Documentation provides that Pearl's authorization for access to Plaintiff accounts is "irrevocable" which is consistent with a joint venture and could be consistent with equity or other exotic hybrid relationship;

K.    The Loan Documentation provides for participation in control by providing that Pearl can control the amount paid and the time to repay Plaintiff's obligations which could be consistent with a joint venture, equity or other exotic hybrid relationship;

L.    The Loan Documentation contains a provision that allegedly provides for changes in payments to Defendants based upon Plaintiff's cash flow which could be consistent with a joint venture, equity or other exotic hybrid relationship; and

M.    Although the Loan Documentation allegedly waives liability for claims made by Plaintiff and the alleged Guarantor's for some claims there is no attempt to disclaim liability to third parties and no indemnity provision for liability to third parties.

41.    Plaintiff is informed and believes that Pearl disputes Plaintiff's contentions set forth above and Plaintiff desires a judicial determination of its rights and duties in the Loan Documentation and regarding the issues set forth above and a declaration as to the nature of the

transaction, and the parties' rights and duties thereunder.

42.     A judicial declaration is necessary and appropriate at this time under the circumstances in order to determine the rights and duties of the parties relating to the Loan Documents and Pearl Loan and issues set forth above, including without limitation the following:

A.     That the Loan Documentation entered into between Plaintiff and Defendants sets forth a loan transaction to which both California and New York usury laws and other substantive laws are applicable – which means Defendants must, at least, meet the minimum requirements of both jurisdictions on all issues;

B.     That Defendants referred to the Pearl Loan as a loan and used terms related to a loan in reference to the Pearl Loan both before and after the transaction was executed;

C.     That the Loan Documentation for the Pearl Loan was ambiguous and since it was drafted by Defendants, the ambiguous terms must be construed against Defendants;

D.     That the Loan Documentation for the Pearl Loan was misleading, deceitful, and/or fraudulent;

E.     That Defendants did not and cannot rely on any alleged exemption to California usury law under California Finance Lender Law with regard to the Pearl Loan transaction since, among other issues, they allege that the transaction was not a loan;

F.     That any alleged exemption to California usury law based upon Pearl's alleged registration under California Finance Lender Law does not apply in this case;

G.     That Defendants are estopped from relying on any alleged exemption to California usury law;

H.     That the provision in the Loan Documentation providing for the alleged adjustment of payments due under the Pearl Loan was illusory and does not make the payments contingent;

I.      That the payments due under the Pearl Loan were not contingent because of, among other issues, the guaranties and the confession of judgment;

J.      There was no effective transfer of title to any alleged "Receipts" and could not be since the definition of "Receipt" limits it to cash received and the referenced cash had not yet been received;

K.      The payments on the Pearl Loan are not a "contingent" liability under New York law;

L.      The term "Specific Amount" is not defined in the Loan Documents which renders it ambiguous and uncertain;

M.      Pearl purposefully overstated the "Specified Percentage" at 15% such that Plaintiff's gross receipts would have to decline disastrously before any alleged provision to reduce the daily payment could take effect rendering the provision illusory and of no effect;

N.      The "Specific Amount" is not based upon the "Specified Percentage" of Plaintiff's average daily gross receipts at the time the Pearl Loan was initiated;

O.      Pearl did not actually and effectively assume any of the ordinary risks of loss that comes with the alleged ownership of "Receipts" of future accounts receivable;

P.      The Pearl Loan includes an alleged "broad form" security agreement that is inconsistent with ownership of any alleged "Receipts";

Q.      The Pearl Loan includes an alleged guaranty that is inconsistent with the contention that the transaction was a purchase and sale of any alleged future "Receipts";

R.      Pearl Loans required Plaintiff to execute a confession of judgment which is inconsistent with ownership of any alleged "Receipts" and makes the transaction in effect a "full recourse" loan;

S.      The Loan Documents, in general, are inconsistent with an alleged sale of "Receipts" which renders them ambiguous and uncertain as well as misleading, deceitful and/or

fraudulent;

T.    Default provisions in the Loan documents makes non-payment both directly and indirectly a default which is inconsistent with an alleged sale of "Receipts";

U.    The Loan Documents do not attempt to separate the alleged portion of the borrower's "Receipts" that supposedly belongs to Pearl and there is no separate bank account for the alleged "Receipts" belonging to Pearl;

V.    Pearl misrepresented its intent to act as a lender and attempted to draft the Loan Documentation to be something other than a loan, did not comply with the regulations regarding a loan, used deceitful, fraudulent and/or misleading tactics and documentation; and violated both the letter and intent of California Finance Lender law;

W.    The loan documentation and funding were provided with no real opportunity for review or negotiation – i.e. are contracts of adhesion;

X.    The business and accounting records of both Plaintiff and Pearl treated the transaction as a loan under the standards of the Financial Accounting Standards Board;

Y.    At all relevant times, Plaintiff considered the Pearl Loan to be short-term business loan and it is a loan under applicable law;

Z.    No sales tax was paid on the transaction;

AA.    That the Pearl Loan is usurious under California Law;

BB.    That the Pearl Loan is criminally usurious under New York law;

CC.    That no interest is due on the Pearl Loan; the interest rate on the Pearl Loan cannot exceed 10%, or the reasonable rate of interest due on the Pearl Loan;

DD.    That the payments made on the Pearl Loan must be disgorged;

EE.    At no point, did Plaintiff ever seek to sell an interest in its accounts receivable, receipts, or proceeds;

FF.    Defendants did not underwrite the transactions based on the collectability risk of

Plaintiff's customers or their ability to pay;

GG.    That Pearl does not own any "Receipts" or other personal property of Plaintiff and no "Receipts" or other personal property of Plaintiff was transferred by the Loan Documents;

HH.    That Pearl could, at most, have a general unsecured claim for breach of contract (rather than a title claim) even if the transaction was construed as a sale of "Receipts" since the alleged "Receipts" were to be produced sometime in the future; and

II.    The validity and amount of any secured claim under the Loan Documents, if any, belonging to Pearl.

43.    To the extent that the Court determines that all or any part of the Pearl Loan was not actually the loan of money, alternatively, a judicial declaration is necessary and appropriate at this time under the circumstances in order to determine the rights and duties of the parties relating to the Pearl Loan as set forth above, including without limitation, the following:

A.    That the Loan Documentation refers to "future accounts, contract rights and other entitlements" which could be consistent with both a joint venture as a share of revenue rights as well as an equity participation relationship and/or could possibly be some exotic hybrid transaction;

B.    There are no disclaimers of a joint venture or equity participation relationship in the Loan Documentation;

C.    The Loan Documentation states that there is no interest rate or payment schedule and no time period" which is consistent with a joint venture as well as an equity participation relationship and/or could possibly be some exotic hybrid arrangement;

D.    The Loan Documentation provides for the assumption of some alleged risk of bankruptcy, "going out of business", or that the business may "slow down or fail" which is consistent with a joint venture relationship as well as equity participation and/or other exotic

hybrid transaction;

    E.    The Loan Documentation provides for Pearl's participation in Plaintiff's business to be raised to 100% of the "Receipts" in the event of some breaches which could be consistent with a joint venture, equity or other exotic hybrid relationship;

    F.    The Loan Documentation provides for Pearl to provide advances which is consistent with a joint venture, equity or other exotic hybrid relationship;

    G.    The Loan Documentation provides for participation in control by providing that Pearl have all "information, authorization, and passwords" for all of Plaintiff's accounts which could be consistent with a joint venture, equity or other exotic hybrid relationship;

    H.    The Loan Documentation provides for participation in control by providing that Pearl has authorization to withdraw payment from Plaintiff's accounts which could be consistent with a joint venture, equity or other exotic hybrid relationship;

    I.    The Loan Documentation provides for participation in control by providing Pearl with a broad irrevocable power of attorney over Plaintiff's business which could be consistent with a joint venture, equity or other exotic hybrid relationship;

    J.    The Loan Documentation provides that Pearl's authorization for access to Plaintiff accounts is "irrevocable" which is consistent with a joint venture and could be consistent with equity or other exotic hybrid relationship;

    K.    The Loan Documentation provides for participation in control by providing that Pearl can control the amount paid and the time to repay Plaintiff's obligations which could be consistent with a joint venture, equity or other exotic hybrid relationship; and

    L.    There is no attempt to disclaim liability to third parties and no indemnity provision for liability to third parties in the Loan Documentation;

    M.    The Loan Documentation provides for participation in control by providing that Pearl can control the amount paid and the time to repay Plaintiff's obligations which could be

consistent with a joint venture, equity or other exotic hybrid relationship; and

N.    That the Pearl Loan is a joint venture, equity participation relationship and/or exotic and/or hybrid relationship and determine the nature and effect of said relationship regarding fiduciary duties, liability to each other and third parties, and other material issues.

**SECOND CLAIM FOR RELIEF**
(Avoidance of Preferential Transfers against Defendant Pearl)
(11 USC Section 547)

44.    Plaintiff hereby incorporates by reference paragraphs 1 through 43, inclusive, as if fully set forth herein.

45.    Pearl made or received transfers in an amount to be proven of Plaintiff's assets for or on account of antecedent debt claimed to be owed by Plaintiff to Pearl within 90 days of the date of the filing of Plaintiff's Bankruptcy case.  Plaintiff is informed and believes and thereupon alleges that Pearl improved its position vis-à-vis Plaintiff in an amount in excess of $70,000 within 90 days of the filing date.

46.    Such transfers were made at a time when Plaintiff was insolvent and/or the transfers rendered Plaintiff insolvent

47.    As a result of such transfers, Pearl received more than it would have received if (a) Debtor's cases were cases under Chapter 7 of the Code; (b) the transfers had not been made; and (c) Pearl received payment of such debt to the extent provided by the Code. The alleged transfers are equally avoidable regardless of whether they are alleged sales of "proceeds" or loans.

48.    The transfers to Defendants should be avoided pursuant to section 547 of the Bankruptcy Code.

**THIRD CLAIM FOR RELIEF**
(Avoidance of Lien and Equitable Subordination against Defendant Pearl)
(11 U.S.C. Section 510(c))

49.    Plaintiff hereby incorporates by reference paragraphs 1 through 48, inclusive, as if fully set forth herein.

50.    Pearl's claim of debt (approximately $100,000, plus or minus, and subject to proof) are allegedly secured by: (a) a security agreement, or agreements; and (b) an alleged UCC-1 financing statement[9] that allegedly grants a broad form security in most if not all of Plaintiff's assets.

51.    The actions of Pearl described above have harmed the bankruptcy estate of Debtor and were inequitable and unjust in nature. The alleged transfers are equally avoidable regardless of whether they are alleged sales of "proceeds" or loans.

52.    As a usurious lender that committed wrongful and illegal acts to unjustly and unduly took advantage of Plaintiff and/or as an alleged purchaser of Plaintiff's assets through fraudulent transfers, Pearl's alleged right to payment from Plaintiff's Bankruptcy Estate, if any exists, should be subordinated for purposes of distribution under principles of equitable subordination pursuant to section 510(c)(1) of the Code, and any claims of lien should be avoided and preserved for the benefit of unsecured creditors pursuant to section 510(c)(2) of the Code.

**FOURTH CLAIM FOR RELIEF**
(Avoidance and Preservation of Lien Claims against Defendant Pearl)
(11 U.S.C. Sections 502, 506, 544, and 510(c))

53.    Plaintiff hereby incorporates by reference paragraphs 1 through 52, inclusive, as if fully set forth herein.

54.    Plaintiff is informed and believes and thereupon allege that Pearl's claims are unsecured due to the fact that there are certain superior liens upon Plaintiff's assets to those of

---

[9] No such UCC-1 has yet been produced.

1    Pearl that completely encumber the fair market value of those assets.   As a usurious lender

2    and/or the transferee in a fraudulent transfer of Plaintiff's assets that committed wrongful and

3    illegal acts to unjustly and unduly took advantage of Plaintiff, Pearl's alleged right to payment

4    from Plaintiff's Bankruptcy Estate, if any exists, should be subordinated for purposes of

5    distribution under principles of equitable subordination.

6
7    55.    Pearl's failure to perfect its lien and file a UCC Financing Statement makes its

8    alleged security interest avoidable. The alleged transfers are equally avoidable regardless of

9    whether they are alleged sales of "proceeds" or loans.

10    56.    Pearl's claim of ownership of any assets belonging to Plaintiff is wrongful and

11    void as set forth above.  The Pearl Loans and alleged loans and/or purchases and/or payments

12    there-under were avoidable preferences and/or fraudulent transfers. The alleged transfers are

13    equally avoidable regardless of whether they are alleged sales of "proceeds" or loans.

14
15    57.    Pearl's liens allegedly securing its subordinated claims and alleged claims of

16    ownership of Plaintiff's assets and the Pearl Loans should be avoided, preserved and transferred

17    to Plaintiff's estate pursuant to section 510(c)(2) of the Code.

18    **FIFTH CLAIM FOR RELIEF**
(Avoidance of Fraudulent Transfers against Defendant Pearl)
19    (11 U.S.C. Section 548)

20    58.    Plaintiff hereby incorporates by reference paragraphs 1 through 57, inclusive, as

21    fully set forth herein.

22
23    59.    Pearl made or received transfers in an amount to be proven of Plaintiff's assets

24    for less than reasonably equivalent value within 2 years of the date of the filing of Plaintiff's

25    Bankruptcy case.  These transfers include, without limitation, the Pearl Loan, the alleged

26    security granted under the Pearl Loan and all payment made there-under and/or the alleged sale

27    of Plaintiff's assets for less than equivalent value.  The alleged transfers are equally avoidable

28    regardless of whether they are alleged sales of "Receipts" or loans.

60.    Such transfers were made at a time when Plaintiff was insolvent and/or rendered Plaintiff insolvent.

61.    The transfers to Defendants should be avoided pursuant to Section 548 of the Bankruptcy Code.

## SIXTH CLAIM FOR RELIEF
### (Avoidance of Fraudulent Transfers against Defendant Pearl)
### (11 U.S.C. Sections 544 and 548)

62.    Plaintiff hereby incorporates by reference paragraphs 1 through 61, inclusive, as fully set forth herein.

63.    Pearl made or received transfers in an amount to be proven of Plaintiff's assets for less than reasonably equivalent value within 4 years of the date of the filing of Plaintiff's Bankruptcy case.  These transfers include, without limitation, the Pearl Loan, the alleged security granted under the Pearl Loan and all payment made there-under and/or the alleged sale of Plaintiff's assets for less than equivalent value.  The alleged transfers are equally avoidable regardless of whether they are alleged sales of "proceeds" or loans.

64.    Such transfers were made at a time when Plaintiff was insolvent and/or rendered Plaintiff insolvent.

65.    The transfers to Defendant should be avoided pursuant to Section 544 and 548 of the Bankruptcy Code.

## SEVENTH CLAIM FOR RELIEF
### (Usury and Unjust Enrichment/Disgorgement against Defendants Pearl and MSI)

66.    Plaintiff hereby incorporates by reference paragraphs 1 through 65, inclusive, as fully set forth herein.

67.    The Pearl Loan set forth a collateralized loan transaction to which California and New York usury laws are applicable.

68.    The loans charge a criminally usurious interest rate under New York law

exceeding 25%.

69.    The loans charge an interest rate usurious under applicable California law.

70.    Plaintiffs, MSI, and Pearl intended to enter into a loan transaction.

71.    The Pearl Loan is usurious per se.

72.    Defendants Pearl and MSI were unjustly enriched by receiving payment of principle and interest in connection with the criminally usurious loans.

73.    Equity and public policy dictate that Defendants Pearl and MSI should not be allowed to receive any amounts paid in connection with the criminally usurious loans.

74.    Plaintiff seeks an order from this Court, declaring that the Pearl Loan is a loan transaction, and thus, void ab initio under New York law because it charged a criminally usurious interest rate in excess of 25%; ordering Defendants to repay Plaintiff all principal and interest previously paid by Plaintiff to Pearl in connection with the criminally usurious loan; and granting such other and further relief as this Court deems just and proper, including disgorging Defendants Pearl and MSI of their ill-gotten profits as a result of any and all similarly issued loans to other victims, and be ordered to pay those ill-gotten profits into this Court.

### EIGHTH CLAIM FOR RELIEF
(Injunction against Defendants Pearl and MSI)

75.    Plaintiff hereby incorporates by reference paragraphs 1 through 74, inclusive, as fully set forth herein.

76.    Plaintiff is entitled to a permanent injunction enjoining Defendants Pearl and MSI, or any one acting in concert with them or under their control, from taking any action enforcing the Pearl Loan agreement or any related document (including the Loan Documents).

77.    Plaintiff seeks an order from this Court, granting a permanent injunction enjoining Pearl and MSI and any one acting in concert with them or under their control, from

1  taking any action enforcing the Pearl Loan agreements or any related document; and vacating

2  the Confession of Judgment and other enforcement mechanisms in connection with the Pearl

3  Loan agreements; and granting such other and further relief as this Court deems just.

4  **NINTH CLAIM FOR RELIEF**
(Value of Assets and Extent of Lien against Defendants Pearl)
5  (11 U.S.C. Section 502, 506 and 551)

6
7        78.    Plaintiff hereby incorporates by reference paragraphs 1 through 77, inclusive, as

8  fully set forth herein.

9        79.    The present amount of total alleged secured claimants in Plaintiff's Bankruptcy is

10  in excess of $2,900,000.  Plaintiff is not presently able to determine the alleged amounts, the

11  alleged security, or the alleged priority of a number of the alleged creditors.  There are also

12  about 40 UCC-1 Financing Statements that have been recorded.  There is no evidence of any

13  UCC-1 Financing Statement filed by Pearl for the Pearl Loan.    Plaintiff contends that Pearl

14  cannot file a UCC Financing Statement because the loan document fails to grant any

15  enforceable security to Pearl.  As such, any alleged UCC Financing Statement from Pearl would

16
17  be void and of no effect.

18        80.    Debtor's assets currently consist mostly of its accounts receivable and other

19  assets which are currently valued at about $1,250,000.

20        81.    As such, Plaintiff contends that Pearl has, at best, an unsecured claim.  This

21  analysis applies even if the transaction was an alleged agreement to sell assets.  The alleged

22  claim would only be an alleged unsecured claim based upon an alleged breach agreement to sell

23  assets.
24
25        82.    Plaintiff is entitled to a determination pursuant to 11 U.S.C. §506 of the validity,

26  priority, amount, and extent of the alleged security interest with regard to the Pearl Loan.

27        83.    Plaintiff further requests that to the extent the secured claim is avoided, the

28  amount of the claim in excess of any allowed secured claim be preserved for the benefit of

1 unsecured creditors pursuant to 11 U.S.C. Section 551.

2 **TENTH CLAIM FOR RELIEF**

3 (Objection to Proof of Claim No. 32-1 and/or Successor Proofs of Claim Pursuant to 11 U.S.C. Sections 502, 506 and 551 against Defendant Pearl)

4 84.    Plaintiff hereby incorporates by reference paragraphs 1 through 83, inclusive, as

5 fully set forth herein.

6 85.    The Pearl Loan Documentation included an alleged "broad form" security

7 agreement.   However, there is no UCC-1 Financing Statement that identifies Pearl as the

8 Creditor.  Therefore, any alleged secured claim should be disallowed.

9 86.    As a usurious lender that committed wrongful and illegal acts to unjustly and

10 unduly took advantage of Plaintiff, Pearl's alleged right to payment from this estate should be

11 disallowed pursuant to 11 U.S.C. Section 502 and any allowed secured claim be preserved for

12 the benefit of Plaintiff's Bankruptcy Estate pursuant to 11 U.S.C. Section 551.

13 86.1    This cause of action shall constitute Plaintiff's objection to Proof of Claim No.

14 32- 1 and/or any amendment and/or successor Proofs of Claim (the "POC") filed in Plaintiff's

15 bankruptcy proceeding on May 1, 2017.  Plaintiff also objects to the POC on the grounds that it

16 is bases solely on an invalid confession of judgment as set forth in the Eleventh Claim for

17 Relief below which should be vacated as set forth therein.

18 **ELEVENTH CLAIM FOR RELIEF**

19 (Vacating Void Confession of Judgment against Defendant Pearl)

20 87.    Plaintiff hereby incorporates by reference paragraphs 1 through 86, inclusive, as

21 fully set forth herein.

22 88.    The Pearl Loan was a collateralized loan transaction to which California laws

23 are applicable.  Even if California law did not apply to the entire transaction it would apply to

24 the Confession of Judgment.

25 89.    The Confession of Judgment is void and unenforceable under California law

since Plaintiff was not represented by an attorney at the time it was alleged to have been executed and no attorney signed the document. Additionally, the Confession of Judgment is void and enforceable under New York law since, among other issues, the affidavit fails to adequately set forth the right to the judgment and any alleged breaches. Under both California and New York law the Confession of Judgment is void because it was obtained through misrepresentation to the court, fraud, and through in illegal usurious loan among other issues. Furthermore, the loan documents do not provide for any right to accelerate the principal of the Pearl Loan based upon simple non-payment and no other alleged breach is specified. Finally, the alleged Confession of Judgment is unenforceable since it violates the usury laws of both California and New York.

90.    Plaintiff is requesting that the Court vacate the Confession of Judgment Nunc Pro Tunc to the date of its entry.

**TWELFTH CLAIM FOR RELIEF**
(Unconscionability against Defendant Pearl)

91.    Plaintiff hereby incorporates by reference paragraphs 1 through 90, inclusive, as fully set forth herein.

92.    The Pearl Loan agreement sets forth a collateralized loan transaction to which California and New York usury laws are applicable.

93.    Plaintiff paid interest in excess of the maximum civil usury rate of 16% and criminal usury rate of 25% under New York law and the maximum usury rate of 10% under California law.

94.    The terms of the Pearl Loan are unconscionable as a matter of law. This is also true if the transactions are alleged sales of "Receipts" since, among other issues, the amount paid was grossly inadequate and the alleged enforcement terms are onerous and inadequately emphasizes in the text.

95.     Plaintiff contends that the Pearl Loan is unenforceable and is requesting the Court order that all amounts paid thereon be disgorged to Plaintiff.

**THIRTEENTH CLAIM FOR RELIEF**
(N.Y. General Business Law § 349 against Defendants Pearl and MSI)

96.     Plaintiff hereby incorporates by reference paragraphs 1 through 95, inclusive, as fully set forth herein.

97.     Defendants Pearl and MSI conspired with and acted in concert with each other to enter into a criminally usurious loan with Plaintiff.  Because of Plaintiff's lack of sophistication and Defendants Pearl and MSI's high pressure sale tactics, the loan should be considered in the same context as consumer loans.

98.     Defendants Pearl and MSI made material misrepresentations in connection with these transactions by, among other things, mischaracterizing the true nature of the transaction as set forth herein in an intentional and knowing effort to avoid the criminal usury laws.

99.     Defendants Pearl and MSI's conduct was unlawful.

100.    Defendants Pearl and MSI willfully and knowingly violated General Business Law § 349.

101.    Plaintiff suffered damages as a direct result of Defendants Pearl and MSI's unlawful and deceptive acts.

102.    Plaintiff seeks an order, ordering Defendants Pearl and MSI to repay all interest previously paid by Plaintiffs, granting an injunction against Defendants Pearl and MSI restraining them from enforcing any of their rights under the criminally usurious loans, awarding Plaintiff direct and consequential damages in excess of $250,000, awarding Plaintiff treble damages, and awarding Plaintiff its attorneys' fees and costs incurred in this action.

### FOURTEENTH CLAIM FOR RELIEF

(California Business & Professions Code Section 17200 et. seq. against Defendants Pearl and MSI)

103.    Plaintiff hereby incorporates by reference paragraphs 1 through 102, inclusive, as fully set forth herein.

104.    Defendants Pearl and MSI's conduct in inducing Plaintiff to enter into the Pearl Loan involved a transaction that substantially occurred within the State of California.

105.    Defendants Pearl and MSI's violations of the California Finance Lender Law, Usury law, and fraud, among other wrongful acts, constitutes a per se violation of Section 17200.

106.    Defendants Pearl and MSI conspired with and acted in concert with each other to violate Section 17200. Defendants Pearl and MSI have engaged and continue to engage in unlawful, fraudulent unfair practices, which are substantially likely to mislead the public by violating the California Finance Lender Law and by violating California and New York usury law, among other wrongful acts.

107.    The business acts and practices of Defendants Pearl and MSI are unlawful within the meaning of the Unfair Competition Law in that the conduct of said Defendants is unlawful, unfair and/or fraudulent.

108.    The above-described unlawful, unfair and/or fraudulent business practices and unfair competition by Defendants Pearl and MSI continue to present a threat to Plaintiffs. Plaintiff is informed and believes that said Defendants have systematically perpetrated deceptive and unfair practices upon members of the public and have intentionally deceived Plaintiff.

109.    The continuance of the aforementioned unlawful conduct constitutes a continuing and ongoing unlawful activity prohibited by Business and Professions Code section 17200 *et seq.* and justifies the issuance of an injunction requiring Defendants Pearl and MSI to

1    act in accordance with California law.  All remedies are cumulative pursuant to Business and

2    Professions Code section 17205.

3        110.    Pursuant to Business and Professions Code section 17203, Plaintiff requests

4    restitution and/or restitutionary disgorgement all sums obtained by Pearl and MSI in violation

5    of Business and Professions Code section 17200 *et seq.* in an amount according to proof

6    including, but not limited to any payments that were made to anything other than principal.

7

8                    **FIFTHTEENTH CLAIM FOR RELIEF**
                 (Fraud against Defendants Pearl and MSI)

9        111.    Plaintiff hereby incorporates by reference paragraphs 1 through 110, inclusive, as

10   if fully set forth herein.

11

12       112.    Regarding the Pearl Loan, among other material misrepresentations, Pearl and

13   MSI represented as follows:

14       A.    That Pearl was operating as a lender and was making a loan that complied with

15   the laws and regulations of the State of California and that was not misleading, fraudulent, or

16   deceptive;

17       B.    That the transaction would be a loan of $120,000 which would all be paid to

18   Plaintiff at the close;

19

20       C.    Both before and after the Pearl Loan was executed, Defendants referred to the

21   Pearl Loan as a loan, orally and in writing, and used terms that apply to loan transaction rather

22   than purchase transaction, including, without limitation: (i) use of the term "consolidation" in an

23   email dated June 14, 2016 from Alan Smith, Senior Financial Consultant of MSI on behalf of

24   Defendants ("Smith"), to Plaintiff regarding the transaction; (ii) use of the term "borrower" in

25   an email dated June 20, 2016 from Smith to Plaintiff regarding the transaction;  (iii)  Plaintiff's

26   use of the term "loan" in an email dated June 23, 2016 from Smith to Plaintiff regarding the

27   transaction; (iv) use of the term "loan" in an email dated August 2, 2016 from Smith to Plaintiff

28

regarding the Pearl Loan dated August 2, 2016, (v) use of the terms "renewal" and "refinance" in an email dated September 15, 2016 from Smith to Plaintiff regarding the Pearl Loan; (vi) use of the terms "renew" and "lender" in an email dated October 12, 2016 from Smith to Plaintiff regarding the Pearl Loan; and (vii) use of the term "renewal" in an email dated October 24, 2016 from Smith to Plaintiff regarding the Pearl Loan; and (viii) use of the words "collection" in an email notice dated November 23, 2016 from Karen Saunders of Pearl Capital, Collections Specialist regarding the Pearl Loan.

D.      That the proposed loans would earn interest at less than the legal rate and that the payments could be made from Plaintiff's cash flow without interfering with Plaintiff's ability to do business;

E.      That daily payment amount would not exceed the lower of $1,399 or 15% of Plaintiff's receipts from its accounts receivable for that day and that the $1,399 daily payment was equivalent to 15% of Plaintiff average daily gross receipts;

F.      The interest rate on the loan was a legal rate;

G.      They misrepresented and failed to state an actual interest rate on the loan and failed to make federal and state mandated disclosures regarding the Pearl Loan; and

H.      Represented that the loan complied with all applicable laws.

113.    Plaintiff relied on these representations and agreed to take out the Pearl Loan. Plaintiff's reliance was reasonable because Defendants Pearl and MSI were acting as lenders and/or brokers and claimed to be knowledgeable and experienced regarding lending issues.

114.    The mis-representations and breaches of Pearl and MSI and other issues with the Pearl Loans are numerous and include, without limitation:

A.      Although, the transactions was proposed by Pearl and MSI as a loan, the documentation attempts to construe the transaction as an alleged "sale" of a portion of a company's "Receipts";

B.      There was no transfer of title to any alleged "Receipts";

C.      The payments are made on a daily basis in the same amount regardless of the "Receipts";

D.      Defendants Pearl and MSI did not effectively assume any of the ordinary risks of loss that comes with ownership;

E.      The Pearl Loans included an alleged "broad form" security agreement that is inconsistent with ownership of any alleged "Receipts";

F.      The Pearl Loans included an alleged guaranty that is inconsistent with ownership of any alleged "Receipts";

G.      The Pearl Loans required Plaintiff to execute a confession of judgment which is inconsistent with ownership of any alleged "Receipts" and makes the transaction an alleged "full recourse" loan.

H.      The Loan Documents, in general, do not use the term loan but are also inconsistent with an alleged sale of "Receipts";

I.      The default provision in the Loan Documents makes non-payment a default which is inconsistent with an alleged sale of "Receipts";

J.      The Loan Documents do not attempt to separate the alleged portion of the borrower's "Receipts" or "proceeds" that supposedly belongs to Pearl and there is no separate bank account for the alleged "Receipts" belonging to Pearl;

K.      The Pearl Loans are usurious under both California and New York law and the high costs of the loan caused the balance transferred to Plaintiff to substantially less than the amount promised;

L.      Pearl misrepresented its intent to act as a lender and attempted to draft the Loan Documentation to be something other than a loan, did not comply with the regulations regarding a loan, used deceitful, fraudulent and/or misleading tactics and documentation; and violated

both the letter and intent of California Finance Lender law and therefore Pearl did not rely and cannot claim it can rely on any alleged exemptions allegedly available to a finance lender in California;

M.    The loan documentation and funding were provided with no real opportunity for review or negotiation – i.e. are contracts of adhesion; and

N.    The business and accounting records of both Plaintiff and Pearl treated the transaction as a loan under the standards of the Financial Accounting Standards Board.

115.    Defendants Pearl and MSI were aware that their representations were false at the time they were made for the purpose of inducing Plaintiff into entering into the Pearl Loan and were aware that Plaintiff was relying on the representations.

116.    As a proximate result of Defendants Pearl and MSI's fraudulent and fraudulent acts and representations, Plaintiff has been damages in an amount in excess of $250,000.

117.    Defendants Pearl and MSI's actions were intentional and malicious such that exemplary damages should be awarded in an amount to be proven at trial.

WHEREFORE, Plaintiffs, and each of them, pray for judgment against Defendants, and each of them, as follows:

**ON THE FIRST CLAIM FOR RELIEF FOR DECLARATORY RELIEF**:

1.    For a judicial declaration regarding the PearL Loan to determine the rights and duties of the parties relating to the Loan Documents and Pearl Loan and issues set forth above, including without limitation, the following:

A.    That the Loan Documentation entered into between Plaintiff and Defendants sets forth a loan transaction to which both California and New York usury laws and other substantive laws are applicable – which means Defendants must, at least, meet the minimum requirements of both jurisdictions on all issues;

B.    That Defendants referred to the Pearl Loan as a loan and used terms related to a loan in reference to the Pearl Loan, both before and after the transaction was executed;

C.    That the Loan Documentation for the Pearl Loan was ambiguous and since it was drafted by Defendants, the ambiguous terms must be construed against Defendants;

D.    That the Loan Documentation for the Pearl Loan was misleading, deceitful, and/or fraudulent;

E.    That Defendants did not and cannot rely on any alleged exemption to California usury law under California Finance Lender Law with regard to the Pearl Loan transaction since, among other issues, they allege that the transaction was not a loan;

F.    That any alleged exemption to California usury law based upon Pearl's alleged registration under California Finance Lender Law does not apply in this case;

G.    That Defendants are estopped from relying on any alleged exemption to California usury law;

H.    That the provision in the Loan Documentation providing for the alleged adjustment of payments due under the Pearl Loan was illusory and does not make the payments contingent;

I.    That the payments due under the Pearl Loan were not contingent because of, among other issues, the guaranties and the confession of judgment;

J.    There was no effective transfer of title to any alleged "Receipts" and could not be since the definition of "Receipts" limits it to cash received and the referenced cash had not yet been received;

K.      The payments on the Pearl Loan are not a "contingent" liability under New York law;

L.      The term "Specific Amount" is not defined in the Loan Documents which renders it ambiguous and uncertain;

M.      Pearl purposefully overstated the "Specified Percentage" at 15% such that Plaintiff's gross receipts would have to decline disastrously before any alleged provision to reduce the daily payment could take effect rendering the provision illusory and of no effect;

N.      The "Specific Amount" is not based upon the "Specified Percentage" of Plaintiff's average daily gross receipts at the time the Pearl Loan was initiated;

O.      Pearl did not actually and effectively assume any of the ordinary risks of loss that comes with the alleged ownership of "Receipts"of future accounts receivable;

P.      The Pearl Loan includes an alleged "broad form" security agreement that is inconsistent with ownership of any alleged "Receipts";

Q.      The Pearl Loan includes an alleged guaranty that is inconsistent with the contention that the transaction was a purchase and sale of any alleged future "Receipts";

R.      Pearl Loans required Plaintiff to execute a confession of judgment which is inconsistent with ownership of any alleged "Receipts" and makes the transaction in effect a "full recourse" loan;

S.      The Loan Documents, in general, are inconsistent with an alleged sale of "Receipts" which renders them ambiguous and uncertain as well as misleading, deceitful and/or fraudulent;

T.      Default provisions in the Loan documents makes non-payment both

directly and indirectly a default which is inconsistent with an alleged sale of "Receipts";

U.    The Loan Documents do not attempt to separate the alleged portion of the borrower's "Receipts" that supposedly belongs to Pearl and there is no separate bank account for the alleged "Receipts" belonging to Pearl;

V.    Pearl misrepresented its intent to act as a lender and attempted to draft the Loan Documentation to be something other than a loan, did not comply with the regulations regarding a loan, used deceitful, fraudulent and/or misleading tactics and documentation; and violated both the letter and intent of California Finance Lender law;

W.    The loan documentation and funding were provided with no real opportunity for review or negotiation – i.e. are contracts of adhesion;

X.    The business and accounting records of both Plaintiff and Pearl treated the transaction as a loan under the standards of the Financial Accounting Standards Board;

Y.    At all relevant times, Plaintiff considered the Pearl Loan to be short-term business loans and it is a loan under applicable law;

Z.    No sales tax was paid on the transaction;

AA.    That the Pearl Loan is usurious under California Law;

BB.    That the Pearl Loan is criminally usurious under New York law;

CC.    That no interest is due on the Pearl Loan; the interest rate on the Pearl Loan cannot exceed 10%, or the reasonable rate of interest due on the Pearl Loan;

DD.    That the payments made on the Pearl Loan must be disgorged;

EE.    At no point, did Plaintiff ever seek to sell an interest in its accounts

receivable, receipts, or proceeds;

FF.    Defendants did not underwrite the transactions based on the collectability

risk of Plaintiff's customers or their ability to pay;

GG.    That Pearl does not own any "Receipts" or other personal property of

Plaintiff and no "Receipts" or other personal property of Plaintiff was transferred

by the Loan Documents;

HH.    That Pearl could, at most, have a general unsecured claim for breach of

contract (rather than a title claim) even if the transaction was construed as a sale

of "Receipts" since the alleged "Receipts" were to be produced sometime in the

future; and

II.    The validity and amount of any secured claim under the Loan

Documents, if any, belonging to Pearl.

2.    To the extent that the Court determines that all or any part of the Pearl Loan was

not actually the loan of money, alternatively, a judicial declaration is necessary and appropriate

at this time under the circumstances in order to determine the rights and duties of the parties

relating to the Pearl Loan as set forth above, including without limitation, the following:

A.    That the Loan Documentation refers to "future accounts, contract rights

and other entitlements" which could be consistent with both a joint venture as a

share of revenue rights as well as an equity participation relationship and/or

could possibly be some exotic hybrid transaction;

B.    There are no disclaimers of a joint venture or equity participation

relationship in the Loan Documentation;

C.    The Loan Documentation states that there is "no interest rate or payment

schedule and no time period" which is consistent with a joint venture as well as

an equity participation relationship and/or could possibly be some exotic hybrid

arrangement;

D.     The Loan Documentation provides for the assumption of some alleged

risk of bankruptcy, "going out of business", or that the business may "slow down

or fail" which is consistent with a joint venture relationship as well as equity

participation and/or other exotic hybrid transaction;

E.     The Loan Documentation provides for Pearl's participation in Plaintiff's

business to be raised to 100% of the "Receipts" in the event of some breaches

which could be consistent with a joint venture, equity or other exotic hybrid

relationship;

F.     The Loan Documentation provides for Pearl to provide advances which is

consistent with a joint venture, equity or other exotic hybrid relationship;

G.     The Loan Documentation provides for participation in control by

providing that Pearl have all "information, authorization, and passwords" for all

of Plaintiff's accounts which could be consistent with a joint venture, equity or

other exotic hybrid relationship;

H.     The Loan Documentation provides for participation in control by

providing that Pearl has authorization to withdraw payment from Plaintiff's

accounts which could be consistent with a joint venture, equity or other exotic

hybrid relationship;

I.     The Loan Documentation provides for participation in control by

providing Pearl with a broad irrevocable power of attorney over Plaintiff's

business which could be consistent with a joint venture, equity or other exotic

hybrid relationship;

J.     The Loan Documentation provides that Pearl's authorization for access to

Plaintiff accounts is "irrevocable" which is consistent with a joint venture and

could be consistent with equity or other exotic hybrid relationship;

K.    The Loan Documentation provides for participation in control by providing that Pearl can control the amount paid and the time to repay Plaintiff's obligations which could be consistent with a joint venture, equity or other exotic hybrid relationship; and

L.    There is no attempt to disclaim liability to third parties and no indemnity provision for liability to third parties in the Loan Documentation;

M.    The Loan Documentation provides for participation in control by providing that Pearl can control the amount paid and the time to repay Plaintiff's obligations which could be consistent with a joint venture, equity or other exotic hybrid relationship; and

N.    That the Pearl Loan is a joint venture, equity participation relationship and/or exotic and/or hybrid relationship and determine the nature and effect of said relationship regarding fiduciary duties, liability to each other and third parties, and other material issues.

**ON THE SECOND CLAIM FOR RELIEF FOR AVOIDANCE OF PREFERENTIAL TRANSFERS:**

3.    That all transfers from Plaintiff to Pearl within 90 days prior to the filing of Plaintiff's Bankruptcy Proceeding be avoided; and

4.    That Pearl be ordered to pay back all amounts transferred to it during the 90 days prior to the filing of Plaintiff's Bankruptcy Proceeding be avoided.

**ON THE THIRD CLAIM FOR RELIEF FOR AVOIDANCE OF LIENS AND EQUITABLE SUBORDINATION:**

5.    For equitable subordination of Pearl's alleged claims;

6.    For preservation of claims, and/or transfer of Pearl's alleged liens securing their

subordinated claims to Plaintiff's estate.

**ON THE FOURTH CLAIM FOR RELIEF FOR AVOIDANCE AND PRESERVATION OF LIEN CLAIMS:**

7.    For avoidance of Pearl's alleged liens;

8.    For preservation of claims, and/or transfer of Pearl's alleged liens securing their subordinated claims to Plaintiff's estate.

**ON THE FIFTH CLAIM FOR RELIEF FOR AVOIDANCE OF FRAUDULENT TRANSFERS:**

9.    For avoidance of the fraudulent transfers made to Defendants Pearl and MSI within two years of the filing of Plaintiff's Bankruptcy Proceeding.

10.    For preservation of claims, and/or transfer of Pearl's alleged liens securing their subordinated claims to Plaintiff's estate.

**ON THE SIXTH CLAIM FOR RELIEF FOR AVOIDANCE OF FRAUDULENT TRANSFERS:**

11.    For avoidance of the fraudulent transfers made to Defendants Pearl and MSI within four years of the filing of Plaintiff's Bankruptcy Proceeding.

12.    For preservation of claims, and/or transfer of Pearl's alleged liens securing their subordinated claims to Plaintiff's estate.

**ON THE SEVENTH CLAIM FOR RELIEF FOR USURY AND UNJUST ENRICHMENT/DISGORGEMENT:**

13.    For an order declaring that each of the agreements entered into between Plaintiff and Pearl as a loan transaction, and thus, void ab initio under New York law because they charge a criminally usurious interest rate in excess of 25%;

14.    An order that Defendants Pearl and MSI repay Plaintiff all principal and interest previously paid by Plaintiff to Pearl in connection with the criminally usurious loans;

15.    An order disgorging Defendants Pearl and MSI of their ill-gotten profits as a result of any and all similarly issued loans to other victims, and be ordered to pay those ill-gotten profits into this Court.

**ON THE EIGHTH CLAIM FOR INJUNCTION:**

16.    For an order from this Court, granting a permanent injunction enjoining Defendants Pearl and MSI and any one acting in concert with them or under their control, from taking any action enforcing the Pearl Loan agreements or any related document including the Loan Documents;

17.    An order vacating the Confession of Judgment and other enforcement mechanisms in connection with the Pearl Loan agreements.

**ON THE NINTH CLAIM FOR RELIEF FOR VALUATION OF ASSETS AND DETERMINATION OF EXTENT OF LIEN:**

18.    For an order declaring the amount of Pearl's claim in Plaintiff's Bankruptcy Proceeding, if any;

19.    For an order declaring the value of any alleged security for Pearl's claim, if any;

20.    For an order declaring to what extent Pearl's claim in Plaintiff's Bankruptcy Proceeding, if any, is unsecured;

21.    For an order that to the extent Pearl's claim is disallowed and/or avoided, the amount disallowed and/or avoided be preserved for the benefit of Plaintiff's Bankruptcy Estate pursuant to 11 U.S.C. Section 551.

**ON THE TENTH CLAIM FOR RELIEF FOR DISALLOWANCE OF CLAIM:**

22.    For an order disallowing Pearl's POC 32-1 filed in Plaintiff's Bankruptcy Proceeding;

23.    For an order that to the extent Pearl's claim is disallowed, the amount disallowed be preserved for the benefit of Plaintiff's Bankruptcy Estate pursuant to 11 U.S.C.

Section 551.

**ON THE ELEVENTH CLAIM FOR RELIEF FOR VACATING VOID CONFESSION**

**OF JUDGMENT:**

24.    For an order vacating the Confession of Judgment Nunc Pro Tunc to the date of

entry of the judgment.

**ON THE TWELFTH CLAIM FOR RELIEF FOR UNCONSCIONABILITY:**

25.    For an order declaring the Pearl Loans unenforceable;

26.    For an order all amounts paid on the Pearl Loans disgorged to Plaintiff.

**ON THE THIRTEENTH CLAIM FOR RELIEF FOR VIOLATION OF NEW YORK**

**GENERAL BUSINESS LAW SECTION 349:**

27.    For an order that Defendants Pearl and MSI repay all interest and other amounts

previously paid by Plaintiffs;

28.    For an order granting a permanent injunction against Defendants Pearl and MSI

restraining them from enforcing any of their rights under the Pearl Loans;

29.    For an order awarding Plaintiff direct and consequential damages in excess of

$250,000.

30.    For an order awarding Plaintiff treble damages;

31.    For an order awarding Plaintiff its attorneys' fees and costs incurred in this

action.

**ON THE FOURTEENTH CLAIM FOR RELIEF FOR VIOLATION OF CALIFORNIA**

**BUSINESS & PROFFESSIONS CODE SECTION 17200 ET. SEQ.:**

32.    For an order that Defendants Pearl and MSI repay and disgorge all interest and

other amounts previously paid to Plaintiff;

33.    For an order granting a permanent injunction against Defendants Pearl and MSI

restraining them from continuing their unlawful business practices;

34.    For an order awarding Plaintiff its attorneys' fees and costs incurred in this

action

**ON THE FIFTEENTH CLAIM FOR RELIEF FOR FRAUD:**

35.    For an award of damages against Defendants Pearl and MSI in the amount in

excess of $250,000;

36.    For exemplary damages against Pearl and MSI in an amount to be proven at

trial;

**ON ALL CAUSES OF ACTION:**

37.    For costs of suit incurred herein;

38.    For attorneys fees and costs if and as applicable;

39.    For prejudgment interest; and

40.    For such other and further relief as may be just and proper.

DATED: May 12, 2017                    LAW OFFICES OF ROBERT M. YASPAN

By: _____
                    ROBERT M. YASPAN
                    General Counsel for Debtor-
                    in-Possession/Plaintiff

# EXHIBIT A



# MERCHANT SOURCE INC.

## MERCHANT AGREEMENT

Agreement dated June 23, 2016 _____ between Pearl Beta Funding, LLC ("PBF") and the Merchant listed below ("MERCHANT")
(Month) (Day) (Year)

### MERCHANT INFORMATION

Merchant's Legal Name: BIO-DATA MEDICAL LABORATORIES, INC

D/B/A: BIO-DATA MEDICAL LABORATORIES    State of Incorporation / Organization: CA

Type of (check one) Entity    Corporation ✓ Limited Liability Company    Limited Partnership    Limited Liability Partnership    Sole Proprietorship    Other

Physical Address: 5494 ARROW HWY    City: MONTCLAIR    State: CA    Zip: 91763

Contact Name: AKEMI UOMOTO    Contact Number: +1.909.445.9727

Mailing Address: SAME AS ABOVE    City: _____    State: _____    Zip: _____

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to PBF (making PBF the absolute owner) in consideration of the "Purchase Price" specified below, the "Specified Percentage" of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to PBF.

Purchase Price: $: 112,671.00    Specified Percentage: 15 %    Specific: DAILY    Amount: $ 1,399.00    Purchased Amount: $ 167,880.00

Merchant may use the Purchase Price solely for business purposes and not for personal, family or household purposes. Merchant is selling a portion of a future revenue stream to PBF at a discount, not borrowing money from PBF. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by PBF. Merchant going bankrupt or going out of business, in and of itself, does not constitute a breach of this Agreement. PBF is entering into this Agreement knowing the risks that Merchant's business may slow down or fail, and PBF assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give PBF a reasonable and fair opportunity to receive the benefit of its bargain.

PBF will debit the Specific Amount each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, PBF (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as PBF receives payment in full of the Purchased Amount. If Merchant's bank is closed on a business day, then PBF will debit the Specific Amount for that day on the next business day in addition to the regularly scheduled debit. Merchant hereby authorizes PBF to ACH debit the Specific Amount from the Account on a daily basis. PBF's payment of the Purchase Price shall be deemed the acceptance and performance by PBF of this Agreement. Merchant understands that it is responsible for ensuring that the Specific Amount to be debited by PBF remains in the Account and will be held responsible for any fees incurred by PBF resulting from a rejected ACH attempt or an Event of Default. PBF is not responsible for any overdrafts or rejected transactions that may result from PBF's ACH debiting the Specific Amount under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between PBF and Merchant, upon the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.

FOR THE MERCHANT (#1) By: AKEMI UOMOTO    X _____
(Print Name and Title)    (Signature)

FOR THE MERCHANT (#2) By: HENRY WALLACH    X _____
(Print Name and Title)    (Signature)

BY OWNER (#1) By: AKEMI UOMOTO    X _____
(Print Name and Title)    (Signature)

BY OWNER (#2) By: HENRY WALLACH    X _____
(Print Name and Title)    (Signature)

# MERCHANT AGREEMENT TERMS AND CONDITIONS

**TERMS OF ENROLLMENT IN PROGRAM**

**16 D/B/A's.** Merchant hereby acknowledges and agrees that PBF is the using "doing business as" or "d/b/a" names in connection in various matters relating to the transaction hereunder and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**REPRESENTATIONS, WARRANTIES AND COVENANTS.** Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

**1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial statements, copies of which have been furnished to PBF, and future statements which will be furnished hereafter at the discretion of PBF, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse change, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise PBF of any material adverse change in their financial condition, operation, ownership. PBF may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to PBF within five business days after request on PBF. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**1 Governmental Approvals.** Merchant is in compliance and will comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage hereafter.

**1 Authorization.** Merchant, and the person(s) signing this agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which has been duly authorized.

**1 Insurance.** Merchant will maintain business-interruption insurance naming PBF as loss payee and additional insured in amounts and against risks as are satisfactory to PBF and shall provide PBF proof of such insurance upon request.

**1 Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this agreement, without PBF's prior written consent. Any such changes will be a material breach of this Agreement.

**1 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and PBF, nor shall Merchant change any of its places of business without prior written consent by PBF.

**1 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**1 Estoppel Certificate.** Merchant will at every and all times, and on time to time, upon at least one (1) day's prior notice from PBF to Merchant, execute, acknowledge and deliver to PBF and/or any other person, firm or corporation specified by PBF, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**1 No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the nest six months and has not consulted with a bankruptcy attorney or any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**10 Working Capital Funding.** Merchant shall not enter into any agreement, agreement or commitment that relates to or involves a Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts future check sales with any party other than PBF.

**11 Unencumbered Receipts.** Merchant has good, complete, encumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of PBF.

**12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Defaults under Other Contracts.** Merchant's its rights hereunder or any interest herein without the prior execution of, and/or performance under, PBF which consent may be withheld not cause or create an event of default by Merchant under any PBF's sole discretion. PBF reserves the rights to assign in contract with another person or entity.

**2.14 Good Faith.** Merchant and Guarantors hereby affirm that Merchant. This Agreement shall be governed by and construed Merchant is receiving the Purchase Price and selling PBF the in accordance with the laws of the state of New York, without Purchased Amount in good faith and will use the Purchase regards to any applicable principals of conflict of law. Any judicial action or proceeding arising hereunder, or the interpretation Price funds to maintain and grow Merchant's business.

**III. EVENTS OF DEFAULT AND REMEDIES** performance or breach hereof, shall, if PBF so elects, be

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default": (a) Merchant shall violate any term or Forums are convenient to it, and submits to the jurisdiction of the covenant in this Agreement or Acceptable Forums and waives any and all objections warranty by Merchant in this Agreement shall prove to have jurisdiction or venue. Should such proceeding be initiated in another been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by PBF to transfer such proceeding to a Merchant; (d) the attempted ACH debit of the Specific Acceptable Forum. ADDITIONALLY, MERCHANT AGREES payment is rejected eight times during the term of this Agreement; (e) Merchant shall transfer or sell all or PROCESS TO COMMENCE ANY LITIGATION BY PF substantially all of its assets; (f) Merchant shall make or send WILL BE PROPERLY SERVED IF MAILED BY CERTIFIED notice of any intended bulk sale or transfer by Merchant; (g) MAIL, RETURN RECEIPT REQUESTED, TO THE MAILING Merchant shall use multiple depository accounts without ADDRESS(ES) LISTED ON PAGE 1 OF THIS AGREEMENT, the prior written consent of PBF (h) Merchant shall change 4.6 Survival of Representation, etc. All representations be depositing account without the prior written consent of warranties and covenants herein shall survive the execution in PBF; or (i) Merchant shall default under any of the terms, delivery of this Agreement and shall continue in full force and covenants and conditions of any other agreement with PBF. all obligations under this Agreement shall have been satisfied.

**3.2 Remedies.** In the Event of a Default, PBF will hold all such Agreements shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed the Said Guarantors will be jointly and severally liable to PBF for Agreement with attorney of their own choosing and have relied all of PBF's losses and damages, in additional to all costs and only on their own attorneys' guidance and advice. No expenses and legal fees associated with such enforcement. construction determinations shall be made against either Party.

**3.3 Remedies.** In case any Event of Default occurs not to herein as dealer.
waived pursuant to Section 4.4. hereof, PBF may proceed to **4.8 Severability.** In case any of the provisions in this Agreement protect and enforce its rights or remedies by suit in equity or is found to be invalid, illegal or unenforceable in any respect by action at law, or both, whether for the specific validity, legality and enforceability of any other provision performance of any covenant, agreement or other provision contained herein shall not in any way be affected or impaired. contained herein, or to enforce the discharge of Merchant's **4.9 Entire Agreement.** Any provision hereof prohibited by law obligations hereunder (including the Guaranty) or any other shall be ineffective only to the extent of such prohibition within legal or equitable right or remedy. All rights, powers and invalidating the remaining provisions hereof. This Agreement remedies of PBF in connection with this Agreement may be and the Security Agreement and Guaranty herein embody the exercised at any time by PBF after the occurrence of an Event entire agreement between Merchant and PBF and supersede of Default, are cumulative and not exclusive, and shall be in all prior agreements and understandings relating to the subject addition to any other rights, powers or remedies provided by matter hereof.
law or equity. **4.10 JURY TRIAL WAIVER.**

**3.4 Costs.** Merchant shall pay to PBF all reasonable costs THE PARTIES HERETO WAIVE TRIAL BY JURY IN AN associated with (a) an Event or Default, (b) breach by COURT IN ANY SUIT, ACTION OR PROCEEDING O Merchant of the Covenants in this Agreement and the ANY MATTER ARISING IN CONNECTION WITH OR I enforcement thereof, and(c) the enforcement of PBF 's ANY WAY RELATED TO THE TRANSACTIONS OR TH remedies set forth in this Agreement, including but not ENFORCEMENT HEREOF. THE PARTIES HERET limited to court costs and attorneys' fees. ACKNOWLEDGE THAT EACH MAKES THIS WAIVE

**3.5 Required Notifications.** Merchant is required to give KNOWINGLY, WILLINGLY AND VOLUNTARILY AN PBF written notice within 24 hours of any filing under Title WITHOUT DURESS, AND ONLY AFTER EXTENSIV 11 of the United States Code. Merchant is required to give CONSIDERATION OF THE RAMIFICATIONS OF TH PBF seven days' written notice prior to the closing of any WAIVER WITH THEIR ATTORNEYS.
sale of all or substantially all of the Merchant's assets or **4.11 CLASS ACTION WAIVER.**
stock. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSER

**IV. MISCELLANEOUS** ANY CLAIMS AGAINST THE OTHER PARTY AS

**4.1 Modifications; Agreements.** No modification, amendment, REPRESENTATIVE OR MEMBER IN ANY CLASS O waiver or consent of any provision of this Agreement shall be REPRESENTATIVE ACTION, EXCEPT WHERE SUC effective unless the same shall be in writing and signed by WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLI POLICY. TO THE EXTENT EITHER PARTY **4.2 Assignment.** PBF may assign, transfer or sell its rights to PERMITTED BY LAW OR COURT OF LAW TO PROCEE receive the Purchased Amount or delegate its duties WITH A CLASS OR REPRESENTATIVE ACTION AGAINS hereunder, either in whole or in part. THE OTHER, THE PARTIES HEREBY AGREE THA **4.3 Notices.** All notices, requests, consents, demands and (1) THE PREVAILING PARTY SHALL NOT B other communications hereunder shall be delivered by ENTITLED TO RECOVER ATTORNEYS' FEES OR COST certified mail, return receipt requested, to the respective ASSOCIATED WITH PURSUING THE CLASS O parties to this Agreement at the addresses set forth in this REPRESENTATIVE ACTION (NOT WITHSTANDING AN Agreement. Notices to PBF shall become effective only upon OTHER PROVISION IN THIS AGREEMENT); AND ( receipt by PBF. Notices to Merchant shall become effective THE PARTY WHO INITIATES OR PARTICIPATES A three days after mailing. MEMBER OF THE CLASS WILL NOT SUBMIT **4.4 Waiver Remedies.** No failure on the part of PBF to CLAIM OR OTHERWISE PARTICIPATE IN AN exercise, and no delay in exercising any right under this RECOVERY SECURED THROUGH THE CLASS O Agreement shall operate as a waiver thereof, nor shall any REPRESENTATIVE ACTION.
single or partial exercise of any right under this Agreement **4.12 Facsimile & Digital Acceptance.** Facsimile signature preclude any other or further exercise thereof or the and digital signatures hereon shall be deemed acceptable for exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies purposes, provided by law and equity. hereunder are cumulative and not exclusive of any remedies

**4.5 Binding Effect; Governing Law; Jurisdiction.** provided by law and equity.
This Agreement shall be binding upon and inure to the benefit of Merchant, PBF and their respective successors and assigns, except that Merchant shall not have the right to assign

Initials: **X** 
**X**



# MERCHANT SOURCE INC.

## PEARL BETA FUNDING LLC -- SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name: **BIO-DATA MEDICAL LABORATORIES, INC**

D/B/A: **BIO-DATA MEDICAL LABORATORIES**    Federal ID#: **33-0782585**

Physical Address: **5494 ARROW HWY**    City: **MONTCLAIR**    State: **CA**    Zip: **91763**

### SECURITY AGREEMENT

**Security Interest.**    This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant grants to PBF a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to PBF under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to PBF upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover PBF's entitlements under this Agreement, PBF is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of PBF's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, PBF or an affiliate of PBF. PBF is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by PBF without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, PBF has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, PBF will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from PBF written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and PBF is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by PBF. Merchant agrees to execute and deliver to PBF such instruments and documents PBF may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. PBF is authorized to execute all such instruments and documents in Merchant's name.

**Additional-Collateral.**    To secure Guarantor's payment and performance obligations to PBF under the Guaranty, the Guarantor hereby grants PBF a security interest in

## BIODATA RADIOLOGY SERVICES, INC.

(the "Additional Collateral"). Guarantor understands that PBF will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Merchant and Guarantor each acknowledge and agree that any security interest granted to PBF under any other agreement between Merchant or Guarantor and PBF (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as PBF deems necessary to perfect or maintain PBF's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes PBF to file any financing statements deemed necessary by PBF to perfect or maintain PBF's security interest. Merchant and Guarantor shall be liable for, and PBF may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by PBF in protecting, preserving and enforcing PBF's security interest and rights.

**Negative Pledge.**    Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.**    PBF shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, PBF may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that PBF may enter into an agreement with Merchant's landlord giving PBF the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.**    Upon any Event of Default, PBF may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to PBF, whether by acceleration or otherwise.

Initials: X _____



# MERCHANT SOURCE INC.

## GUARANTY

Personal Guaranty of Performance. The undersigned Guarantor(s) hereby guarantees to PBF, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

Guarantor Waivers. In the event of a breach of the above, PBF may seek recovery from Guarantor for all of PBF's losses and damages by enforcement of PBF's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral PBF may hold pursuant to this Agreement or any other guaranty.

PBF does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) PBF's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to PBF. In addition, PBF may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to PBF; (ii) release Merchant from its obligations to PBF; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to PBF under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that PBF must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

Guarantor Acknowledgement. Guarantor acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

Joint and Several Liability. The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

FOR THE MERCHANT (#1) By:  AKEMI UOMOTO
(Print Name and Title)

X _____
(Signature)

SSN# 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

Driver's License Number _____

FOR THE MERCHANT (#2) By:  HENRY WALLACH
(Print Name and Title)

X _____
(Signature)

SSN# 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

Driver's License Number _____

BY OWNER (#1) By:  AKEMI UOMOTO
(Print Name and Title)

X _____
(Signature)

SSN# 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

Driver's License Number _____

BY OWNER (#2) By:  HENRY WALLACH
(Print Name and Title)

X _____
(Signature)

SSN# 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

Driver's License Number _____



# MERCHANT SOURCE INC.

### APPENDIX A - THE FEE STRUCTURE:

A. Underwriting Fee $ **1,299.00**    to cover underwriting and related expenses.

B. Origination Fee  $ **5,600.00**    (or **15 %** of the funded amount, depending on size of advance)

C. NSF Fee (Standard)  **$35.00 (each)**    Up to EIGHT TIMES ONLY before a default is declared.

D. Rejected ACH / Blocked ACH / Default Fe **$2,500.00**    When Merchant BLOCKS Account from our Debit ACH, or when Merchant directs the bank to reject our debit ACH, which places them in default (per contract). When Merchant changes bank Account cutting us off from our collections.

E. Bank Change Fee  **$50.00**    When Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

F. Wire Fee - Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

FOR THE MERCHANT (#1) By: **AKEMI UOMOTO**    X _____
(Print Name and Title)                      (Signature)

FOR THE MERCHANT (#2) By: **HENRY WALLACH**    X _____
(Print Name and Title)                      (Signature)



# MERCHANT SOURCE INC.

### AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**DEFINITIONS:**

PBF: Pearl Beta Funding, LLC

Seller: BIO-DATA MEDICAL LABORATORIES, INC
      (Merchant's Legal Name)

Merchant Agreement: Merchant Agreement between PBF and Seller, dated as of June 23, 2016

**Designated Checking Account:**

Bank Name: BANK OF AMERICA        Branch: _____

TaxID: 33-0782585 _____

ABA: Routing: X 12 1000358        DDA: Account: 0002 0561 2305

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.
By signing below, Seller attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Seller should keep a copy of this important legal document for Seller's records. DISBURSMENT OF ADVANCE PROCEEDS. By signing below, Seller authorizes PBF to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. By signing below, Seller also authorizes PBF to collect amounts due from Seller under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:

In the amount of: $ 1,399.00 _____

(Or) Percentage of each Banking Deposit: 15 _____ %

On the Following Days: MONDAY-FRIDAY _____

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Seller's financial institution for any reason, including without limitation insufficient funds, Seller understands that PBF may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Seller also authorizes PBF to initiate ACH entries to correct any erroneous payment transaction.
MISCELLANEOUS. PBF is not responsible for any fees charged by Seller's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).
This Authorization Agreement is to remain in full force and effect until PBF has received written notification from Seller at the address set forth below at least 5 banking days prior of its termination to afford PBF a reasonable opportunity to act on it. The individual signing below on behalf of Seller certifies that he/she is an authorized signer on the Designate Checking Account. Seller will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Seller requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

Seller: BIO-DATA MEDICAL LABORATORIES, INC        Date: June 23, 2016
      (Merchant's Legal Name)                            (Month) (Day) (Year)

Title: C F O

X _____
              (Signature)

Print Name: AKEMI UOMOTO _____

 MERCHANT SOURCE INC.

Dear Merchant,

Thank you for accepting an offer from Pearl Beta Funding. We are looking forward to building a relationship with your business that allows you to reach and exceed your goals. Please note that prior to funding your account, our Underwriting department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step.

**Option 1) Please provide information required for read-only access\* to your business account.**

Bank portal website: _____

Username: _____

Password: _____

Security Question/Answer 1: _____

Security Question/Answer 2: _____

Security Question/Answer 3: _____

Any other information necessary to access your account: _____

_____

**Option 2) Provide an email address which will receive a secure 3rd party link, allowing you to log in on your own machine through industry standard Decision Logic. (https://www.decisionlogic.com/)**

Your valid email address (please ensure correct spelling and case sensitivity):

_____

**Option 3) You may call into a secure line to complete this step with a live representative.**
**Secure Verification Number: (347)-817-7780**

\* Read only access can be easily arranged by calling your Bank, allowing our Underwriters to view account information without being able to transfer, debit or otherwise access funds.

# EXHIBIT B

**Fill in this information to identify the case:**

Debtor 1 __Biodata Medical Laboratories, Inc.__

Debtor 2
(Spouse, if filing) _____

United States Bankruptcy Court for the: __Central__ District of __California__
(State)

Case number __6:16-bk-20446__

## Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Pearl Beta Funding, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Valerie Bantner Peo Esq.
Buchalter, A Professional Corporation
Name
55 Second Street, 17th Floor
Number    Street
San Francisco    CA    94105
City    State    ZIP Code

Contact phone 415-227-0900
Contact email vbantnerpeo@buchalter.com

**Where should payments to the creditor be sent? (if different)**

Steven Berkovitch, Esq.
Name
40 Exchange Place Suite 1306
Number    Street
New York    New York    10005
City    State    ZIP Code

Contact phone 212-433-2297
Contact email steven@abfservicing.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☒ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

Official Form 410    Proof of Claim    page 1

American LegalNet, Inc.
www.FormsWorkFlow.com

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ＿＿ ＿＿ ＿＿ ＿＿

**7. How much is the claim?**

$ 47,411.82 plus interest, fees and costs . **Does this amount include interest or other charges?**

☒ No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached Judgment of Confession

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Basis for perfection: ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $ 0.00

Amount of the claim that is secured: $ 0.00

Amount of the claim that is unsecured: $ ＿＿＿＿＿＿＿ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $ ＿＿＿＿＿＿＿

Annual Interest Rate (when case was filed) ＿＿＿ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ ＿＿＿＿＿＿＿

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

American LegalNet, Inc.
www.FormsWorkFlow.com

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. *Check all that apply:*

|  | | Amount entitled to priority |
|---|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_____) that applies. | | $_____ |

* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    05/01/2017
                    MM / DD / YYYY

_Signature_

Denise H. Field, Esq

**Print the name of the person who is completing and signing this claim:**

| Name | Denise H. Field, Esq. | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Counsel to Pearl Beta Funding, LLC | | |
| Company | Buchalter, A Professional Corporation | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 55    Second Street, 17th Floor | | |
| | Number    Street | | |
| | San Francisco | CA | 94105 |
| | City | State | ZIP Code |
| Contact phone | 415-227-0900 | Email | dfield@buchalter.com |

American LegalNet, Inc.
www.FormsWorkFlow.com

**FILED: ERIE COUNTY CLERK 11/25/2016 04:23 PM**

NYSCEF DOC. NO. 5

INDEX NO. 813094/2016

RECEIVED NYSCEF: 11/25/2016

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ERIE

PEARL BETA FUNDING, LLC

Plaintiff,

Index No: 16 813094

-against-

BIODATA MEDICAL LABORATORIES, INC. BIO-
DATA MEDICAL LABORATORIES, INC. BIODATA
RADIOLOGY SERVICES, INC. WHAA, LLC
DIVERSIFIED LABORATORY SERVICES, INC.
MICRO PAP CORPORATION, BIODATA RADIOLOGY
SERVICES, INC. and
AKEMI UOMOTO AND HENRY WALLACH,

Defendants.

**JUDGMENT OF CONFESSION**

| | |
|---|---|
| Amount confessed | $167,880.00 |
| Less Amount Paid | $130,157.00 |
| Amount Due | $37,723.00 |
| Attorney's Fees | $9,430.75 |
| Interest | $33.07 |
| Costs by Statute | 15.00 |
| Filing Fee | 210.00 |
| Execution Fee | |
| Cost Total    + | 225.00 |
| Judgment Total | $47,411.82 |

STATE OF NEW YORK, COUNTY OF NEW YORK: ATTORNEY'S AFFIRMATION

The undersigned, an attorney at law of the State of New York, affirms that he is one of the attorneys of PEARL BETA FUNDING, LLC attorney for the plaintiff herein and states that the disbursements above specified are correct and true and have been or will necessarily be made or incurred herein and are reasonable in amount and affirms this statement to be true under the penalties of perjury.

Dated:  November 23, 2016

*S Berkovitch*

Steven Berkovitch Esq.
Attorney for Plaintiff

1-
FILED AND
DOCKETED
Nov 25 2016
AT   04:22 P   M
ERIE COUNTY CLERK

1 of 3

(212) 433-2298

JUDGMENT entered the _____ day of _____, 20___.

On filing the foregoing Affidavit of Confession of Judgment made by the defendant herein, sworn to the 23RD day of June 2016.

NOW, ON MOTION OF Steven Berkovitch, Esq. attorney for plaintiff it is

ADJUDGED that plaintiff PEARL BETA FUNDING, LLC, having an address at 100 William Street 9th Floor New York, NY 10038 does recover of

BIODATA MEDICAL LABORATORIES, INC. BIO-DATA MEDICAL LABORATORIES, INC. BIODATA RADIOLOGY SERVICES, INC. WHAA, LLC DIVERSIFIED LABORATORY SERVICES, INC. MICRO PAP CORPORATION, BIODATA RADIOLOGY SERVICES, INC. , having an address of 5494 Arrow Hwy Montclair CA 91761 and AKEMI UOMOTO AND HENRY WALLACH having an address at 1251 Brookmere Rd. Pasadena CA 91105 and 31607 Blue Meadow Ln Westlake Village CA 91361 respectively the sum of $37,723.00 and attorney's fees in the amount of $9,430.75 with interest of 16% in the amount of $33.07 as calculated from November 21, 2016 making a total of $47,186.82; together with $225.00 costs and disbursements, amounting in all to the sum of $47,411.82; and that the plaintiff have execution therefor.

_____
Clerk

**Judgment Signed and Filed** 11/25/2016

**Christopher L. Jacobs County Clerk**

2 of 3

Index No.    Year    RJI    No.    Hon.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ERIE

PEARL BETA FUNDING, LLC

Plaintiff,

-against-

BIODATA MEDICAL LABORATORIES, INC. BIO-DATA MEDICAL LABORATORIES, INC.
BIODATA RADIOLOGY SERVICES, INC. WHAA, LLC DIVERSIFIED LABORATORY
SERVICES, INC. MICRO PAP CORPORATION, BIODATA RADIOLOGY SERVICES, INC.  and
AKEMI UOMOTO AND HENRY WALLACH

~~Defendants~~

## JUDGMENT

**Steven Berkovitch, Esq.**

Attorney for Plaintiff

Office and Post Office Address, Telephone
**Steven Berkovitch Esq.**
**40 Exchange Place Suite 1306**
**New York, NY 10005**
**Phone: 212-433-2298**
**Fax:  347-344-6187**

Service of a copy of the within        is hereby admitted.

Dated,

Attorney(s) for

Please take notice
☐  Notice of Entry
that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within name court on
☐  Notice of settlement
that an order     of which the within is a true copy will be presented for
settlement to the HON.   one of the
judges of the within named court, at
on    at
Dated,                                                          Yours, etc.

Attorney(s) for

3 of 3